Ann POLLOCK, Plaintiff,

v.

Basil CASTROVINCI, Individually and Trustee of the Basil Castrovinci Associates, Pension Trust, and Basil Castrovinci Associates, Inc., Defendants.

No. 78 Civ. 2071 (GLG).

United States District Court,
S. D. New York.

June 26, 1979.

Opinion July 23, 1979.

As Amended Sept. 10, and Nov. 7, 1979.

Shatzkin, Cooper, Labaton, Rudoff & Bandler, New York City, for plaintiff; Joel C. Feffer, Madelyn C. Littman, New York City, of counsel.

Eugene Mittelman, New York City, for defendants.

## ON MOTION TO STRIKE JURY DEMAND

GOETTEL, District Judge.

Defendants have moved to strike plaintiff's demand for a jury trial claiming that all the plaintiff's claims relate to the defendants' breach of their fiduciary responsibility either under the common law or under ERISA, and that all such claims have always been treated as equitable. Plaintiff submitted a demand for a jury trial as to all counts. However, in open court on June 15, 1979, she has limited her demand to Counts I through V. Counts I through V allege that the defendants violated sections 403(c)(1), 403(d)(1), 404(a)(1), 406(a)(1)(D), 406(b) of ERISA and that they violated their fiduciary responsibility and engaged in prohibited transactions by attempting to divert assets of the plan to their own use, primarily through terminating the plan and attempting to recover the surplus assets remaining in it after payment of all accrued benefits to participants.

Plaintiff's right to a jury trial must derive from the Seventh Amendment to the Constitution, as applied in light of the substantive and procedural provisions of ERISA, or directly from some provisions of ERISA. The Seventh Amendment to the Constitution provides that "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right to trial by jury shall be preserved." Although the thrust of the Amendment was to preserve the right to jury trial as it existed in 1791, it has long been settled that the right extends beyond the common law forms of action recognized at that time, *Parsons v. Bedford*, 3 Pet. 433, 7 L.Ed. 732 (1830), and that the Seventh Amendment applies to actions enforcing statutory rights and requires a jury trial upon demand if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law. *Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). The litmus test for determining the right to a jury trial is whether the nature of the legal issues to be tried is "legal" or "equitable." A jury trial may be demanded if the nature of the issues is legal regardless of whether or not the legal issues are intertwined with other equitable issues.

This case was brought under section 502 of ERISA which in relevant part provides that:

"(a) A civil action may be brought—
(1) by a participant or beneficiary—

.      .      .      .      .

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

.      .      .      .      .

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this subchapter or the terms of the plan; . . ."

It has been held that the section sets forth, in the alternative, two remedies which are available to the beneficiary: subsection (a)(3) creates a civil action for equitable

relief and subsection (a)(1)(B) creates a different civil action for legal relief. *Stamps v. Michigan Teamsters Joint Council No. 43*, 431 F.Supp. 745 (E.D.Mich.1977); *Bouton v. Central States, Southeast and Southwest Areas Pension Fund*, BNA Pens. Rep. No. 226, D–1 (E.D.Tenn.1978) (CIV 2–78–189). In *Stamps* and *Bouton*, the court held that an action for past due benefits under section 502(a)(1)(B) of ERISA was a legal claim for which a party was entitled to a jury trial.

The defendants claim the *Stamps* and *Bouton* cases are not precedent in regard to the plaintiff's claims since the instant action is not one for past due benefits, but rather one for an "equitable" pro-rata share of the pension plan's surplus. In addition, the defendants assert that *Stamps* incorrectly interpreted the legislative history of ERISA in finding that Congress intended to allow a legal cause of action under section 502.

■ The legislative history of ERISA indicates that section 502 actions should be guided by the caselaw developed under section 301 of the Labor-Management Relations Act of 1947, 29 U.S.C. section 185. The Joint Explanatory Statement of the Committee of Conference reads, in relevant part, as follows:

"All such actions in Federal or State courts are to be regarded as arising under the laws of the United States in similar fashion to those brought under section 301 of the Labor-Management Relations Act of 1947."

H.R.Conf.Rep.No.93–1280, 93d Cong. It is clear that, under section 301 of the LMRA, an employee who sues for money damages under a collective bargaining agreement is entitled to a jury trial upon request, *Allen v. United Mine Workers of America*, 319 F.2d 594 (6th Cir. 1963), and defendants admit that decisions construing section 301 of the LMRA as creating an action in contract for past due benefits under a pension plan are correct. However, defendants claim that Congress' reason in providing remedies in sections 502(a)(1)(B) and 502(a)(3) was merely to provide concurrent jurisdiction for federal and state court claims. Defendants point to section 502(e)(1), as the basis for their argument, which states that the federal courts have exclusive jurisdiction for all actions except those under section 502(a)(1)(B), for which state courts have concurrent jurisdiction. Defendants' reasoning on this point is illogical since section 502(e)(1) states nothing as to actions under section 502(a)(3).

■ In the final analysis, whether the instant action is at law, or one seeking equitable relief, depends upon the terms and provisions of the pension plan. A provision was added to the plan that the participants are only entitled to benefits as specifically provided for by the terms of the plan and after liabilities to participants have been met that the employer can recover the remaining funds. If this section of the plan was illegally added, the relief to be granted, reformation of the plan, is clearly equitable. The issues to be determined thereafter, benefits due under the reformed plan, would be legal.

It is apparent that the Court must first decide the equitable issue concerning reformation of the plan. If defendants prevail, the action goes no further. If the plaintiff prevails, issues will be presented for jury determination.

The only remaining matter to be decided is whether a jury should be impanelled at the start of the trial and hear evidence going to the reformation issue. Whether this is desirable depends in part upon whether evidence on the subsequent issues would require similar testimony. In order to determine this, the plaintiff is directed to submit immediately a list of special interrogatories that would be submitted to the jury at the conclusion of the trial so that the Court may assess their similarity to the equitable issue.

## OPINION

This is the fifth in an apparently never ending series of litigations resulting from the purchase of Harold Faggen Associates, Inc. by Titan Group, Inc. Although the

major business of Harold Faggen Associates was in servicing pension plans, most of the recent litigation has revolved around problems with the company's own pension plan.

The plan and the trust were first established on June 3, 1957.[1] The pension plan was a defined benefit plan—one that contains a formula setting forth the benefits to be received by participants upon retirement. The effect is to fix the employee's interest by a formula applicable to him individually rather than by granting a share of the trust fund. For many years the Internal Revenue Service ("IRS") allowed such plans to be funded by contributions made under a number of different formulas. All contributions to this plan came from the employer; the employees never made any contributions. At one extreme the contributions would be adequate merely to pay accrued benefits—those which would be due to the participants if the plan were terminated. At the other extreme, the funding would be adequate to pay total benefits that might ultimately be required of the plan. During the time that Harold Faggen owned the company, the contributions made were well in excess of those necessary to pay accrued benefits, but within the limits allowed by the IRS. The result was that, by the end of 1970, when the value of accrued benefits was about $200,000 and the value of total benefits nearly $800,000, the market value of the fund's assets was $526,549—about halfway between the two extremes.

In December of 1968 Harold Faggen sold his business to the Titan Group, Inc., a public corporation which was a mini-conglomerate. Faggen was kept on as president of the company under an employment contract executed at the time of the sale. At about the same time, the individual defendant in this action, Basil Castrovinci, was hired as a vice president and actuary.

Titan was aware of the overfunding of the pension plan and wanted to recapture this surplus, which was estimated to be in the $300,000 to $400,000 range. There were a number of ways by which this might have been accomplished, but all of them created other problems for Titan. One suggestion was to merge the Faggen plan with other existing Titan Group plans, which would have provided a cushion sufficient that no contributions to the merged plan would be necessary for a couple of years. This proposal was apparently unacceptable to management since its wish was to end all existing Titan pension plans and to replace them with a single corporate-wide profit sharing plan. This goal was achieved in 1973, effective as of November 1972. To accomplish this change, all of the 26 salaried employees of Faggen's company (then known as Titan Actuarial Services, Inc.) were removed from its plan and their termination benefits of $217,546 paid to them, leaving only hourly union employees in the plan. The result of this change was to increase enormously the amount of overfunding of accrued benefits in the fund.

At this point another possible solution was to terminate the plan as to the union employees and place them in the profit sharing group. (The plan always gave the employer the right to terminate it.) The problem with this idea was that Titan, which was primarily in the construction business, had a great number of unionized workers in its other division and did not desire to put them in the profit sharing plan. (Uniform treatment of classes of employees was necessary in order to have a plan qualified for tax purposes under the Internal Revenue Laws.)

The situation became even more unbalanced when, in 1973, the data processing division of the company was sold, taking with it most of the remaining union employees. After their termination benefits were paid out, there remained only a half dozen or so union employees in the plan, which still had an overfunding of several hundred thousand dollars. The chairman of Titan directed the subsidiary to find a way so that "the $400,000 cash will flow back

1. The plan and trust are complementary documents which contain no inconsistencies and, for all practical purposes, can be considered as a single instrument.

into Titan . . ..'' But no way to accomplish this could be found consistent with the company's other wishes.

In 1972 a dispute had arisen between the Titan owners and Faggen concerning the purchase of his company. Titan ultimately sued Faggen in this district, alleging securities law violations in concealing certain facts material to the sale. While it was apparently only a collateral issue, Castrovinci testified in March 1974 in that action, on behalf of Titan, concerning the overfunding of the pension plan and the ability of the employer to recapture the excess. During the time that this dispute was evolving, Faggen continued his employment. He was, however, stripped of his title, President of the company, and Castrovinci was substituted in his place although, for all practical purposes, Faggen still continued as the head of the business. This arrangement proved unworkable and in January 1973, on Castrovinci's request, Titan finally discharged Faggen. The prior federal litigation persisted in the courts for some years. Faggen prevailed in the district court, and the verdict was upheld on appeal. *Titan Group, Inc. v. Faggen*, 513 F.2d 234 (2d Cir.1975). A petition for certiorari was denied. 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975).

While the first action was pending in federal court Faggen sued Titan in the New York State courts. Titan asserted a number of counterclaims unrelated to the claim of securities violations. This case has dragged through the state court for more than six years and is still pending. Another action was commenced in the state court by Titan against Faggen to compel him to relinquish his position as trustee of the pension plan.[1A] That action was settled and Faggen withdrew as trustee.

With the departure of Faggen the pension business of Titan Actuarial Services

fared poorly. Faggen took a substantial number of his clients with him. Certain morale problems and the continuous litigation did not help the situation.

Starting in 1974 Titan made efforts to dispose of its subsidiary. In the spring of 1975 Castrovinci made an offer to purchase the company himself. Ultimately, in October 1975 he did buy out the company. The purchase was for a nominal amount, $30,000 in notes, but Castrovinci also had to give to Titan his own notes covering the receivables of the company (whether collected or not) and had to undertake to meet several obligations of Titan, including the payments on the lease-purchase of a computer which was then allegedly worth substantially less than the amounts still due on the lease. In order to secure these notes Castrovinci executed a second mortgage on his house in favor of Titan.

At the time of the sale two documents were executed. One related to the purchase of the business by Castrovinci, who called the new company "Basil Castrovinci Associates, Inc." The other, a separate document not referred to as a sales agreement, released Castrovinci from certain noncompetitive aspects of his earlier contracts, and also transferred to him all of the assets and liabilities of the pension plan and trust.[2]

From the evidence presented at this trial, it is apparent that the executives of the Titan mini-conglomerate did not understand that the problems in recapturing the grossly excessive pension contributions were unique to it, and that a new company, particularly one that had no existing pension plan, would not encounter the same difficulties. Castrovinci and other actuaries associated with him, however, did not exhibit the same lack of understanding. Shortly after purchasing the company, Castrovinci took steps to terminate the plan

---

**1A.** While there was uncontradicted testimony to this effect at trial, we are advised by both counsel that the action was merely threatened and not actually commenced.

**2.** Basil Castrovinci, the president and sole director of Basil Castrovinci Associates, Inc., is an actuary and is enrolled by the Joint Board of

Actuaries established pursuant to the Employee Retirement Income Security Act of 1974. The names of the plan and trust were changed to the Basil Castrovinci Associates, Inc. Pension Plan and Trust some time after September 1975.

and recapture the surplus. When Titan learned of this it sued Castrovinci in New Jersey for the pension plan assets. That action is also still pending.[3]

While Castrovinci's new company did not have the problems that Titan did in altering its pension plan, new problems were caused by the passage of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"). Section 403(c)(1) of the Act provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan." Section 4044 of the Act allows recapture of the surplus assets upon termination only if several qualifications are met, one of which is that "the plan provides for such a distribution in these circumstances."

■ Prior to ERISA there was no such problem in recapturing surplus assets. According to the evidence presented at trial, the IRS would approve the reversion of surplus to employers upon termination after satisfaction of participants' benefits. Indeed, a plan that dedicated all proceeds to employee benefits would not have qualified under the then IRS rules as a tax exempt pension plan, since the amount of benefits to be paid would be unknown. Because ERISA appeared to change this, Castrovinci decided that the plan would have to be amended before the IRS, and the newly formed Pension Benefit Guarantee Corp. ("PBGC") could approve termination and recapture.[4]

Throughout their existence, the plan and trust impliedly reserved the right to recover assets after satisfaction of employee liabilities (Plan Preamble and § 1 of the Trust). However, Section XIII of the plan, which controls the employer's right to amend and terminate the plan, stated in its original form:

"The employer shall have power to amend the terms of this Plan in any way provided that no such amendment shall enable it to recover or divert from the exclusive benefit of the Participants the fund already deposited in the Trust. Nor shall such amendment alter the rights and benefits as described herein of Retirees as of the date of such amendment."[5]

■ Section XIII of the plan was mandated by Internal Revenue Code section 401(a)(2), 26 U.S.C. § 401(a)(2), which required pension trusts, in order to be qualified plans, to state that assets would not be diverted from the exclusive benefit of the participants. Under this section, plans qualify merely by agreeing not to divert funds prior to the satisfaction of the plan's liabilities. The regulations under the Internal Revenue Code make it apparent that the employer can recover after termination residual assets that result from actuarial error. An employer is foreclosed only from recovering surpluses which arise from prohibited amendments, such as changes in benefit provisions or eligibility require-

---

**3.** Faggen may have been a moving factor in causing Titan to sue Castrovinci to recover the pension assets. During the course of their New York litigation, Faggen's attorney (who represents the plaintiff in this action) offered to disclose to Titan how they could recover hundreds of thousands of dollars from Castrovinci. Faggen and his attorney hoped that their assistance to Titan against Castrovinci could promote a settlement of their New York litigation, a possibility that did not come to pass. Thereafter it is alleged that Faggen, who received stock of Titan as part of the sale of his company, threatened a stockholders' derivative suit if Titan's management did not sue Castrovinci.

**4.** While the defendant, the PBGC, and defendants' counsel (who apparently had something to do with the drafting of ERISA) all assumed

that the plan was subject to the terms of ERISA, a recent letter from the PBGC to plaintiff's counsel, dated July 3, 1979, questions this assumption. Plans of professional service employers having less than twenty-five active participants are excluded from the provisions of ERISA pursuant to § 4021(b)(13), 29 U.S.C. § 1321(b)(13).

**5.** In the original 1957 version this language was followed by a paragraph describing the allocation of assets among beneficiaries if, upon termination, there were insufficient funds to meet the accrued liabilities of the plan. In 1968 the latter paragraph was deleted as no longer applicable since all accrued benefits were fully funded.

ments. 26 C.F.R. § 1–401–2(b). The plan, therefore, did not explicitly reserve a right to recover residual assets since, under IRS Rules, none should have been intentionally created.

Under various provisions of the plan, such as Section VIII, it was clear that the participants' benefits were specifically limited to those defined and did not include any right to share in a surplus. The provisions dealing with termination specified that accrued benefits would be paid to participants subject to reduction only in the event of underfunding and with no reference to increase in the event of overfunding. Section XIII dealt separately with amendments to the plan and with termination of the plan. The first sentence, dealing with amendments, clearly precluded changes in the plan that would reduce benefits or alter anti-diversion provisions of other sections of the plan and trust.

Since ERISA appeared to require an affirmative statement providing for distribution of residual assets, defendants amended the provision quoted above by adding to the first sentence of Section XIII after the word "trust" the phrase "at any time prior to the satisfaction of all liabilities with respect to the Participants and their Beneficiaries." Then, in a paragraph dealing with termination of the plan, there was added, after a description of the priorities of distribution, a sentence stating that "any residual assets shall be distributed to the Employer."

Defendants then, on April 5, 1977, submitted the plan to the PBGC. They did not describe the manner in which the excessive funding had arisen or highlight the fact that the amendment allowing recapture was recent. The PBGC thereafter issued an informal opinion letter approving, on the basis of the information supplied, the recapture of the surplus assets. Defendants obtained the requisite Notice of Sufficiency certifying that the assets were sufficient to satisfy guaranteed benefits under the plan, and later the Internal Revenue Service issued a determination letter stating that termination would not affect the existing tax qualification of the plan.

While the plan was in the initial stages of termination, the plaintiff, Ann Pollock, voluntarily terminated her employment with the defendant. On November 19, 1976, she left her employment and on January 3, 1977, she applied for a lump sum payment of her pension benefits. By this time the plan had been amended but the requisite approvals had not yet been obtained from the government agencies. Although Ms. Pollock contends that when she applied for her lump sum benefits she was not aware that termination of the entire plan was in the offing, the evidence was to the contrary. A notice concerning the amendment of the plan had been posted on the employees' bulletin board shortly before plaintiff left although she denied having seen it.[6]

In order to terminate the plan the defendants had to deal with the union representing about six covered employees. Castrovinci discussed the situation with the union representative and also with his shop steward. While he did not personally talk with the plaintiff, the shop steward testified that, in early August of 1976, prior to the plaintiff's resignation, she advised the entire membership, some seven or eight persons, of the possibility of the termination of the plan and the recapture of the surplus by the employer. In agreeing to the termination of the plan the union (in addition to the payment of full vested benefits) got a commitment for a 10 percent increase in hourly wages for the union employees. This increase was not to compensate them for the loss of the surplus but merely for their loss of potential benefits under the plan. Whatever their motivation, the union members have yet to receive their pay increase, just as the defendant has yet to recapture completely the excess funding. The wage increase was contingent upon government approval of termination. A

---

6. The evidence was equivocal as to whether a copy of the amendments was given to each union employee or whether it was merely post-ed. In the absence of any proof of delivery of amendments to the union members, the other alternative seems more likely.

written memorandum concerning the union's agreement to the termination was entered into in January of 1977.

█ The defendants did not immediately pay plaintiff her lump sum benefit as requested. They claim that they believed that she was working for a competitor, and that their practice was not to pay cash termination benefits under those circumstances.[7] In addition, there was a dispute as to the correct amount of the cash benefit, which varied depending upon whether a 4 percent or 6 percent investment rate was assumed.

The dispute concerning her entitlement to the lump sum benefit and its correct calculation dragged on through 1977 until the plan was terminated. During this period the plaintiff made some broad demands for plan documents, including a blanket request for "all documents . . . to which I have been entitled since the enactment of ERISA." Defendants agreed to provide her with the plan, a summary of the plan and certain other documents, but although some documents were sent on February 27, 1977, the plan itself was not sent. Castrovinci testified that he did not send plaintiff a copy of the plan since she had not specifically asked for it and that since she was concerned primarily about receiving the proper amount of lump sum benefit, the plan would not assist her in this regard. Defendant also offered to let her review all documents at their office, which was near her place of employment. In addition, the shop steward was directed to call her on two occasions to invite her to review her file.

During the early part of 1977 the plaintiff and two other former employees (one of whom, like plaintiff, was awaiting her lump sum benefits, the other of whom had earlier been paid, and both of whom were friendly with Harold Faggen) made numerous complaints to several interested government agencies concerning Castrovinci's operation of the plan. Clearly, however, none claimed a right to the surplus that would exist upon the plan's termination.

In September of 1977, two months after termination of the plan, the defendants offered plaintiff her lump sum benefit in a recalculated amount, the accuracy of which has not been questioned. Plaintiff refused to accept it, stating that she was awaiting confirmation from the IRS as to the amount to which she was properly entitled. Throughout the latter part of 1977 she corresponded with the IRS case officer and at the end of the year was awaiting further communication from him. It was also clear that, by this time if not earlier, the plaintiff was aware that the plan had been terminated and that all that remained was IRS approval of the distribution of the surplus, without recalculation of the tax years in which deductions were taken for contributions.

On February 2, 1978, the IRS notified plaintiff that it had made a favorable determination allowing the defendant to receive the surplus assets tax-free. The notice told her that she had ninety days in which to contest this to the tax authorities. She took no action to contest the IRS decision. More that ninety days after receipt of the notice, but less than ninety days after the effective date of the IRS action, she instead commenced this action.

The plaintiff charges a number of violations of ERISA. All of the alleged violations arise directly out of the amendment to the plan and the recapture of the surplus.[8] Two small personal claims were alleged, one having been added in an amended complaint.

---

7. Prior to ERISA, pension plans commonly provided for a forfeiture of benefits in the event a former employee entered into competition with the sponsoring employer. ERISA, which by this time was in full effect, proscribes such practices.

8. A number of security law claims were also asserted, but they were withdrawn by counsel before the trial of this action. The securities claims were brought under both the federal and New York State law, as well as common law fiduciary and contract principles. They did not add anything essential to the gravamen of the pension plan claims.

At the commencement of the action, plaintiff moved for a preliminary injunction against distribution or use of the surplus by the defendants. Both parties then cross-moved for summary judgment. The motion for a preliminary injunction was denied in an opinion dated August 10, 1978, on a finding that the plaintiff had failed to demonstrate a probability of success. Consistent with the rule in this circuit against granting summary judgment when any possible factual dispute exists, both the cross-motions for summary judgment were denied.[9]

The plaintiff appealed the denial of the preliminary injunction and both parties urged that their motions for summary judgment should have been granted. In the Court of Appeals, the parties stipulated to withdraw the appeal, the defendant made certain guarantees concerning the availability of the surplus funds in the event that it lost the action, and the parties were sent back to the district court for a prompt trial. Although the Court inconvenienced itself to make available time for such a trial, neither party was ready during the time suggested by the appellate court. Instead, extensive discovery was engaged in and when the case was ultimately called for trial six months later, both parties were still not ready and a further adjournment had to be granted for the preparation of a pretrial order. Ultimately the case went to trial.

Initially we should note that this action was filed as a putative class action. No motion was ever made to certify a class pursuant to Fed.R.Civ.P. 23(c)(1). Absent such an application the class action can, perhaps, be disregarded. *See Yulio v. Moore-McCormack Lines, Inc.*, 387 F.Supp. 872 (S.D.N.Y.1975). Some courts have indicated, however, that the court has an obligation on its own motion to make a class determination. *See, e.g., Senter v. General Motors Corp.*, 532 F.2d 511, 520–521 (6th Cir. 1976); *Castro v. Beecher*, 459 F.2d 725, 731 (1st Cir. 1972). Of course the named plaintiff's failure to protect the interests of the class by moving for certification bears strongly on the adequacy of the representation that the class members might have been expected to receive. *East Texas Motor Freight v. Rodriguez*, 431 U.S. 395, 405, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). Moreover, it has been abundantly clear that this action was not appropriate for class treatment, and that this plaintiff would not, in any event, have been the proper class representative. While initially contending for a much larger class, plaintiff's counsel eventually confined his claims to the five active union employees, and the one or two former union employees who had not as yet taken a cash payout from the plan in exchange for a release. Such a small class naturally lacks numerosity. Moreover, there were available to this particular plaintiff certain claims (*e.g.*, not having been involved in the union bargaining for the termination of the plan) and defenses (*e.g.*, having requested a cash payout prior to the termination of the plan) that were not common to the remaining members of the class.

In any event, Harold Faggen was not called as a witness at the trial and, indeed, little additional evidence was presented beyond that available at the time of the original motions. In light of Faggen's nonappearance it is probably unnecessary to consider his claim that the pension plan was intentionally constructed to create a bonanza for those still participating in it at the time of its termination. As noted in the

---

9. The conclusions of law on the other substantive issues in the opinion of August 10, 1978, are adopted in full herein.

In addition to permitting the parties the opportunity to obtain extrinsic evidence construing the plan, *see, e.g., Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317 (2d Cir. 1975), the defendants' motion had to be denied because the person most familiar with the plan and its intent, Harold Faggen, submitted an affidavit stating that Section XIII of the plan was consciously adopted to prevent the return of surplus assets to the employer in order to insulate them from business creditors, and to guarantee a substantial payment to participants upon termination. While this Court found Faggen's contentions to be somewhat incredible in light of other facts discussed below, his affidavit raised an issue of credibility that could not be resolved solely upon the papers.

Court's prior opinion, the claim is not only inherently incredible but so unsubstantiated that one has to doubt that such a result could have been intended. Moreover, the testimony at the trial clearly indicated that Faggen had previously taken a firm position that the surplus was recapturable by the employer at will. Indeed, he testified at a deposition in the first Titan action against him that the company could practically, at its will, draw down the excess of several hundred thousand dollars.

More important, Faggan and his wife were among the large group of salaried employees removed from the plan in 1972. Together they had 60 percent of the total accrued benefits of all participants. The IRS treated their removal as a partial termination, but none of the surplus assets of the fund was paid out or otherwise transferred—only the accrued benefits. Faggen and his wife, if his claim concerning the import of Section XIII is correct, were entitled to hundreds of thousands of dollars at that time, and yet made no claim for it. For that matter, the individual defendant Castrovinci and his chief assistant Ferrara (who testified at trial) were also transferred out of the plan. Nevertheless, neither they nor, until this dispute occurred, anyone else ever disputed the fact that the surplus would go to the employer after all accrued benefits had been paid. The union shop steward, who would have been one of the major beneficiaries of this employee bonanza, testified at trial that all the union employees knew of the overfunding (although they did not know of its enormous size) and none of them had claimed any interest in it.

■ As the plaintiff has argued, "stripped of its ERISA garb, this action, . . . presents only an issue of contract interpretation." (Plaintiff-appellant's Reply Brief on Appeal, at 1.) The factual evidence indicates that, as a matter of contract interpretation, the industry treated

surplus assets as being recoverable by the employer. Moreover, this is consistent with the general rule of trusts that where a trust is fully performed, without exhausting the trust estate, a resulting trust arises for the benefit of the creator of the trust, unless he has manifested a different intention. *See Scott on Trusts*, § 430. The few cases which have had occasion to deal with the issue in a pre-ERISA context, have arrived at the same conclusion. *See, e. g., In re Marine Midland Trust Co.*, 144 N.Y.S.2d 4 (Sup.Ct. 1955); *In re Crescent Athletic Club of Brooklyn*, 33 F.Supp. 132 (E.D.N.Y. 1940).

Only three cases appear to have considered the issue post-ERISA. The *In re C. D. Moyer Co. Trust Fund* case, 441 F. Supp. 1128 (E.D. Pa. 1977) (relied upon in this Court's earlier opinion), is perhaps the leading case. The decision of the district court was affirmed on the opinion below by the Third Circuit, 582 F.2d 1273 (3d Cir. 1978). The district court determined that the employer's recovery of residual assets upon termination did not violate ERISA in a defined benefit plan having a provision essentially identical to Section XIII of this plan. The only distinction that can be made of the *Moyer* case is that there the amendment specifically allowed recovery of assets due to errors in actuarial computation.[10] The overfunding in this case was initiated by a method of contribution that was permissible, albeit not mandatory.[11] The overfunding increased from a series of business events which, on a per capita basis, made the overfunding enormous. In a sense this was an actuarial error since, as the actuaries testified, they advised management that the business decisions were creating actuarially unsound contributions to the fund. The defendants described the development of the overfunding in a letter to the IRS on November 15, 1977 and the service accepted this as an actuarial error.

---

10. This is consistent with the regulation under § 401(a)(2) of the Internal Revenue Code which permits recovery for surplus caused by actuarial error. 26 C.F.R. § 1–401–2(b).

11. After the purchase of the company by Titan, only one relatively small, $18,000, contribution was ever made to the pension plan, and that was in 1971. The present defendants made no additional contribution.

The only case which has prohibited recapture is *Kruzynski v. Richard Bros. Punch Co.*, BNA Pens.Rep. No. 211, D–8 (E.D. Mich. Oct. 13, 1978). In that case, the Court noted that the plan had not been amended to allow recapture and, consequently, that the requirements of ERISA had not been met. Moreover, the portion of the plan preventing diversion of assets appeared in its termination section. Indeed, there was a specific provision that, in the event of termination, no part of the corpus or income of the fund could be used for or diverted to any purpose other than the exclusive use of the beneficiaries of the plan. In light of such language the inability of the employer to recapture the surplus was apparent.

The most recent case dealing with the question is *Audio Fidelity Corp. v. Pension Benefit Guaranty*, No. 78–0623–R (E.D. Va. Dec. 12, 1978). In that case there had not been a specific amendment of the plan prior to termination to allow recapture of surplus. The year following the termination of the plan, the employer attempted to amend it to insert such a provision. PBGC opposed this amendment asserting that it was ineffective and informed the employer that the residual assets must be distributed to the plan's participants. The court found the failure to make a timely amendment to be unimportant since the plan did not contemplate, at the time of termination, that there would be any excess due to overfunding. Consequently, the retroactive amendment to the plan was found to be valid under the authority of *Moyer, supra.*

The court went on to find that even if this were not the case the court possessed the equitable power under ERISA to reform pension contracts to remedy mistakes. Since it was never intended that the surplus should be paid to the participants, the court ordered the plan to be reformed to provide for the terms of the amendment. This, the court held, automatically satisfied the requirement that the plan provide for distribution. Otherwise, the court stated, the distribution of the surplus of the plan to the participants would unjustly enrich them at the expense of their employer.

All of the foregoing considerations are present here. This plan contained specific provisions dealing with termination which specified that the participants' rights would be certain accrued benefits. The amount of these benefits was subject to reduction in the event of underfunding, but there was no provision providing for an increase in the event of overfunding. While the first sentence of Section XIII, standing alone, supports plaintiffs' contentions, when it is read in the full context of the plan, which is a defined benefit one, it is apparent that the provision was intended only to prohibit amendments reducing benefits to the extent funded.

While plaintiff has not pressed the argument, and indeed has impliedly excluded it, we must consider the possibility that ERISA altered the construction to be afforded to the plan. Neither a review of the complicated provisions of ERISA nor a reading of its legislative history, however, indicates any intent to prohibit the recapture of residual assets if such were allowed by the meaning and terms of the plan as it existed prior to ERISA. A different conclusion would amount to an *ex post facto* application of ERISA clearly not intended by Congress in its passage of the Act. The employer is entitled to a refund of the surplus.

There remain to be considered the two relatively insignificant claims asserted by the plaintiff in Counts XII and XIII of the amended complaint.

Count XII relates to the failure of the defendant to supply plaintiff with the amended version of the plan. On September 19, 1977, plaintiff wrote requesting "all documents, statements, reports, notices, etc. to which I have been entitled since the enactment of ERISA." ERISA section 104(b)(4), 29 U.S.C. § 1024(b)(4), provides, in relevant part, that "the administrator shall, upon written request of any participant . . . furnish a copy of the . . . trust agreement, contract, or other instrument under which the plan is established or operated." ERISA section 502(c), 29 U.S.C.

§ 1132(c), provides that "any administrator who fails or refuses to comply with a request for any information which such administrator is required . . . to furnish to a participant . . . may in the court's discretion be personally liable to such participant . . . in the amount of up to $100 a day from the date of such failure or refusal . . . ."

Defendants should have sent the plaintiff a copy of the plan. It is also apparent, however, that she was not proceeding entirely in good faith, and the defendants had reasonable grounds for believing that her real interest was the computation of her cash benefit. Indeed, as late as March of 1978 her requests were solely for "financial statements." There is no indication that her rights have been in any way prejudiced by the failure to furnish her with the plan. Consequently, the court, in its discretion, will not award the penalties provided for by the Act.

 Count XIII concerns the delay in offering payment to the plaintiff of the lump sum benefit to which she was entitled. Her initial entitlement arose under the provisions of the plan for employees who had resigned. Under the plan the employer had the right to refuse to pay cash benefits if it so chose. Her present claim is based upon her rights under the termination provisions of the plan. (Had the defendants properly paid her before the plan terminated, all of this litigation could perhaps have been avoided.) Within a couple of months of obtaining PBGC approval of the termination of the plan, and prior to approval by the IRS of tax-free recapture, the defendants offered plaintiff the lump sum benefit to which she is entitled. She chose not to take it and instead pursued the other issues in this litigation. Under such circumstances she does not appear entitled to any monetary damages on this claim, much less the punitive damages sought.

The final matter to be considered is the question of attorneys' fees which, under section 502(g) of ERISA, 29 U.S.C. § 1132(g), may be awarded to either side. The defendants' counsel has vigorously pressed for an award of fees. However, considering that the actions of the defendants were not in all respects proper, and particularly considering the fact that they did not candidly set before the federal agencies the true nature of the problem involved in the termination actions they intended to take (to say nothing of the fact that they may have erroneously assumed that the termination was controlled by ERISA), it does not appear that defendants' counsel should be awarded fees in this action.

The foregoing constitutes the Court's findings of fact and conclusions of law under Fed.R.Civ.P. 52.

Judgment will be entered by the clerk for defendants, with court costs only.