**Guido FERRANTE, Plaintiff,**

v.

**INTERNATIONAL SALT COMPANY, Harvey Poloni, Darrell Fry and Bill Shaver, Defendants.**

Civ. No. 85–71276.

United States District Court, E.D. Michigan, S.D.

May 24, 1988.

Ronald Mack, Detroit, Mich., for plaintiff.

Donald A. Vansulichem, Detroit, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

**ANNA DIGGS TAYLOR,** District Judge.

Plaintiff Guido Ferrante brings this action against his long-time former employer, International Salt Company, and three former supervisors at International Salt's Detroit mining plant: Harvey Poloni, general manager; Darrell Fry, personnel and safety manager; and Bill Shaver, plant superintendent. Plaintiff alleges that he was induced to retire and thereby forfeit termination pay by the misrepresentations of the individual defendants that the Detroit plant at which they were all employed would not close for at least ten years and that, even if it should close, the defendant corporation would never pay the termination pay benefits outlined in the benefits guidebook for salaried employees ("the Guide").

The Detroit plant did in fact close in January, 1983, approximately three months after plaintiff's official retirement. Salaried employees on the payroll at the time of the closing received termination pay as outlined in the Guide and Ferrante received none. As a result of his decision to retire in November, 1982, plaintiff had forfeited both termination pay and an enhanced pension.

Plaintiff's initial complaint, filed in Wayne County Circuit Court on February 25, 1985 [# 85–505116], charged the individual defendants with fraudulent misrepresentation (count I) and the corporate defendant with breach of employment contract (count II). Defendants removed the case to this court on March 22, 1985, alleging that plaintiff's claims were preempted by Sec. 510 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 et seq., 1140.

A bench trial was held on October 7 and 8, 1987. This memorandum opinion constitutes the finding of fact and conclusions of law of the court in the matter.

### I.

Mr. Ferrante was first employed by defendant International Salt Co. on July 25, 1946 in an hourly position in the production department of the Detroit plant. In 1967, he was promoted to a supervisory post at the same location and continued in this capacity until his official retirement on November 1, 1982. As of his last day of work, September 17, 1987, Mr. Ferrante was earning $575.00 per week before taxes. Both plaintiff and the individual defendants testified that, throughout his career at International Salt, Mr. Ferrante had been considered an exemplary employee, and Mr. Ferrante testified that he had received merit raises virtually every year of his career with International Salt.

Plaintiff testified that he first began thinking about retirement after a trip to Pheonix, Arizona, where he and his wife, Jean Ferrante, signed a mortgage on a new home in 1979. Mrs. Ferrante testified that her mother had given her $35,000 which was used as a down payment on the Arizona home and that she and her husband had planned to rent the home until plaintiff's expected retirement at age 62. In fact, when Mr. Ferrante actually retired in November, 1982, he was only 57 years old. Because of his early retirement, he began receiving a pension which was approximately 30% less than that which he would have received had he retired at age 62.

Although the role, if any, of the individual defendants in plaintiff's decision to retire early is the fundamental dispute in this litigation, the plaintiff acknowledged in his testimony that there were a number of other factors affecting his decision on whether and when to retire. First, Mr. Ferrante testified that, for several years preceding his retirement, there had been great pressure to meet the plant's production goals. Plaintiff stated that meeting those goals became increasingly difficult because equipment at the plant was continually breaking down and the company had refused to repair or replace it. Second, Mr. Ferrante testified that because of the pressures of his work he had developed severe ulcers in the mid–1970's and that his ulcer was "killing him" in the last years before his retirement. Plaintiff was also concerned for his safety because a fellow supervisor, Paul Mayer, had been "beat up" in 1981, apparently by a disgruntled employee. Plaintiff further testified that at one point his own windshield had been smashed; again, an unknown union employee had been suspected. Finally, Mr. Ferrante stated that he feared that the union representing the hourly workers at the Detroit plant might strike at or before the expiration of their collective bargaining agreement with International Salt on September 1, 1982. Plaintiff was concerned that in the event of a strike, the corporation might permanently shut the plant rather than attempt to outlast a costly and difficult labor dispute at a time of economic uncertainty for the business.

Jean Ferrante, plaintiff's wife, testified that she was opposed to plaintiff's retirement in 1982. She asserted that although plaintiff wanted to retire "because he couldn't take the pressure," she advised him to seek professional counseling and to take a medical leave. Mrs. Ferrante stated that "retirement pinched our income" and that it caused a "75% drop in monthly income."

Plaintiff's fundamental claim is that his decision to retire when he did, and the consequent loss of termination pay and benefits, was made in reliance on the misrepresentations of the individual defendants that the Detroit plant would not close in the near future and that even if it did, the defendant corporation would never pay the termination benefits provided by the "Salaried Employees' Guide." Mr. Ferrante asserts that, but for his reliance upon the misrepresentations of his superiors, he would not have retired but would have continued to work until the plant's closing in January, 1983, and would thereby have received termination pay on the same terms as did all other salaried employees on the payroll at that time.

Both parties agree that the terms and conditions of the termination pay benefit are defined on page 7 of the salaried employees' Guide, entitled "Your Company, Your Job, Your Benefits—A Guide for Salaried Employees." *See* Plaintiff's Exhibit 1.

The termination pay provision of the Guide indicates that for employees such as Mr. Ferrante, who were hired on or before August 17, 1973 and have 20 or more years of service, the amount of termination pay is determined by the following formula:

1 week's salary for each year of service completed up to 20, plus 4 weeks' salary for each year of service completed over 20.

Immediately following this formula on page 7 of the Guide is a paragraph which states:

We do not grant termination pay in the case of death, resignation, voluntary retirement or discharge.

*See* Plaintiff's Exhibit 1. Based on this formula, plaintiff has calculated the unpaid termination benefit to which he claims he is entitled as follows: $575.00 x 20 years and $575.00 x 4 weeks x 16.3 years for a total unpaid benefit of $48,990.00.

In answer to plaintiff's allegations, the defendants maintain that plaintiff's decision to retire was a voluntary one, made independently and without any misrepresentation by any of the defendants as to either the future of the Detroit plant or the likelihood of payment of termination benefits. The corporate defendant, International Salt, argues that because Mr. Ferrante freely decided to enter into voluntary retirement, he was not entitled to any termination pay because of the express exclusion for voluntary retirement set forth on page 7 of the Guide. The individual defendants, Bill Shaver, Darrell Fry and Harvey Poloni, categorically deny that they ever told Mr. Ferrante that the Detroit mine would never close of that, in the event of a closing, no termination benefits would be paid.

Defendants further contend that plaintiff's state law claims of misrepresentation and breach of employment contract are preempted by Section 510 of ERISA, 29 U.S.C. §§ 1001, 1140 (1982).

## II.

Because the evidentiary burdens and the conclusions to be drawn from the evidence may vary according to the law applicable to plaintiff's claims, the court will first address the legal issue of whether those claims are governed by state fraud and contract law, or whether ERISA, and particularly Sec. 510, 29 U.S.C. § 1140, preempts the plaintiff's state law allegations.

After careful consideration of the terms of ERISA and legal precedent, as well as the particular claims and evidence presented at trial, the court finds that plaintiff's claims are preempted by Secs. 510 and 514 [29 U.S.C. §§ 1140 and 1144 respectively] of ERISA.

Section 510 provides in relevant part:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan ...

29 U.S.C. § 1140.

The Sixth Circuit has indicated that Congress enacted Sec. 510 with the primary purpose of "preventing unscrupulous employers from discharging or harassing their employees" in order to keep them from obtaining vested benefits. *West v. Butler*, 621 F.2d 240, 245 (1980). *See also Gavalik v. Continental Can Co.*, 812 F.2d 834 (3rd Cir.1987).

Moreover, the legislative history of this section makes it clear that, in enacting Sec. 510, Congress specifically contemplated the kind of economic injury alleged by the plaintiff here. Senator Hartke, speaking on behalf of his proposal that the Secretary of Labor be directed to establish administrative procedures to enforce what became Sec. 510, stated:

Most collective bargaining agreements protect employees against discharge without good cause and provide effective enforcement machinery in arbitration proceedings whose results are enforceable under Section 301 of the Labor-Management Relations Act. But roughly half of all pension participants are not unionized and so they lack protection. Especially vulnerable are managers and executives whose substantial pension potentialities provide an incentive to their discharge before vesting.

119 Cong.Rec. 30374, *reprinted in* Subcomm. on Labor, the Senate Comm. on Labor and Public Welfare, Legislative History of the Employee Retirement Income Security Act of 1974, Pub.L. No. 93–406 (Comm.Print 1976) at 1774–75, as quoted in *West v. Butler*, supra, 628 F.2d at 245.

Although plaintiff here has framed his allegations in terms of state law claims of misrepresentation and breach of employment contract, the broad terms of ERISA's preemption provision, Sec. 514, 29 U.S.C. § 1144, clearly indicate that ERISA is the controlling law in the instant labor dispute. Sec. 514(a) preempts "any and all state laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. *See* 29 U.S.C. § 1144(a).

The federal courts have consistently held that ERISA's preemption provision must be interpreted broadly. In *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2899–2900, 77 L.Ed.2d 490 (1983), the Supreme Court acknowledged that "the breadth of § 514(a)'s pre-emptive reach is apparent from that section's language. A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." Noting that Congress inserted explicit exceptions wherever it wanted to limit the preemptive effect of § 514(a), the Supreme Court observed "in fact ... Congress used the words 'relate to' in their broad sense. To interpret § 514(a) to preempt only state laws specifically designed to affect employee benefit plans would be to ignore the remainder of § 514 ... nor ... can § 514(a) be interpreted to pre-empt only state laws dealing with the subject matters covered by ERISA—reporting, disclosure, fiduciary responsibility and the like." *Id.*, at 97–98, 103 S.Ct. at 2900.

The *Shaw* court also discussed each of the "limited exceptions" to Sec. 514(a) preemption spelled out by Congress and it is apparent that none applies to this case.

Plaintiff argues that ERISA does not apply because the corporate defendant, International Salt, did not comply with the reporting requirements of §§ 1023 and 1024 of the Act. Plaintiff presumably argues that because the annual benefits statement mailed to him made no mention of termination pay benefits, that the defendant had thereby violated §§ 1023 and 1024, and ERISA does not apply. This argument must be rejected.

First, plaintiff offers no explanation or legal support for the assertion that failure to indicate potential termination benefits in the annual statement mailed to employees constitutes a violation of §§ 1023 and 1024. Even assuming such violation, however, plaintiff fails entirely to explain why such failure removes the termination pay benefit from the broad ambit of ERISA regulation.

■ It is obvious that employers cannot avoid the requirements of ERISA by simply failing to comply with the statute's reporting requirements. Indeed, federal courts have refused to even penalize employers who have violated ERISA's reporting requirements absent a showing of prejudice to the employee. *See Wesley v. Monsanto*, 554 F.Supp. 93 (D.C.Mo.1982), *aff'd.*, 710 F.2d 490 (8th Cir.1983); *Pollock v. Castrovinci*, 476 F.Supp. 606 (S.D.N.Y. 1979), *aff'd.*, 622 F.2d 575 (2nd Cir.1980).

In the instant case, plaintiff has demonstrated no such prejudice from the failure to report the termination pay benefit in his annual statements. First, plaintiff testified that he considered the salaried employee's Guide, which detailed the termination pay provision on page 7, as "binding" and that the company was "required" to comply with its terms. Second, plaintiff acknowledged that all other provisions of the Guide were complied with "as written." Finally, the court finds plaintiff's assertion that he was "confused" by the lack of mention of termination pay in the annual statement is not credible, given his admission that he considered the Guide to be binding, his failure to mention such confusion in his deposition and the testimony of all three individual defendants that Mr. Ferrante never mentioned any such confusion at any time.

In sum, because Sec. 514(a) of ERISA provides for broad preemption of state laws relating to employee benefit plans, and because in enacting Sec. 510 of the Act, Congress clearly contemplated the kind of economic injury alleged by the plaintiff here, the court concludes that plaintiff's state law claims are preempted by Sec. 510 of the Act, 29 U.S.C. § 1140.

### III.

Having decided that plaintiff's claims are preempted by the terms of ERISA, the court must determine whether the plaintiff has demonstrated a claim of denial of termination benefits that constitutes interference with rights protected by Sec. 510 of the Act.

The plaintiff must bear the initial burden of proof. "As in the context of employment discrimination claims under Title VII, employees alleging discrimination under ERISA bear the burden of making out a *prima facie* case of discrimination," *Gavalik v. Continental Can Co.*, 812 F.2d 834, 852 (3rd Cir.1987) (citations omitted).

Moreover, to establish a *prima facie* case under Sec. 510, an employee must show "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled. 29 U.S.C. § 1140 (1982)". *Gavalik*, 812 F.2d at 852.

In establishing a claim, the prevailing case law and the statutory language of Sec. 510 dictate that the essential element of proof is specific intent to engage in proscribed activity. *See Gavalik*, supra, at 851; *Titsch v. Reliance Group, Inc.*, 548 F.Supp. 983, 985 (S.D.N.Y. 1982), *aff'd.*, 742 F.2d 1441 (2nd Cir.1983). And while specific intent to discriminate will rarely be demonstrated by "smoking gun" evidence, see *Gavalik*, supra, at 852, the evidentiary burden may be satisfied by introduction of circumstantial evidence. *See West v. Butler*, supra, 621 F.2d 240 (6th Cir.1980); *Maxfield v. Sinclair International*, 766 F.2d 788, 791 (3rd Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773, (1986).

■ After careful consideration of the documentary, testimonial and circumstantial evidence presented at trial, the court finds plaintiff has failed to establish a prima facie case of either prohibited employer conduct or specific intent to engage in such prohibited activity in violation of Sec. 510 of ERISA.

The essence of Mr. Ferrante's claim is that he was induced to retire and forfeit termination pay by the defendants' misrepresentations that the Detroit plant would not soon close, and that even if it did, termination benefits would never be paid.

The testimonial evidence of the parties is in sharp conflict as to this critical issue. Mr. Ferrante testified that he approached Bill Shaver, the plant superintendent, and Darrell Fry, the personnel manager, in June, 1982 and inquired about the possibility of the plant closing and payment of termination benefits. At some later point, plaintiff also spoke to Harvey Poloni, the general manager, about the same matters. The plaintiff testified that Fry and Poloni said the plant probably would not close, and that all three defendants stated that, in the event of a closing, Mr. Ferrante would never get termination pay.

The testimony of the three defendants on the closing issue was not inconsistent with that of the plaintiff. Mr. Shaver stated that he told the plaintiff that rumors of a closing had been circulating for years, and that the plant "probably" wouldn't close. Fry and Poloni also testified that they told Mr. Ferrante that a closing was unlikely. Fry testified that he expected the plant to remain open for the life of the three year collective bargaining agreement with unionized employees signed in September, 1982 and Mr. Poloni stated that in August, 1982, he was working on the plant's 1983 budget and a five-year plan for the plant's operations.

The conflict in the testimony of the parties is much greater with regard to the second critical claim by plaintiff. Mr. Ferrante asserts that all three defendants told him that if there were a closing, he would *never* be paid the benefits he would be due in the event of a termination. All three defendants categorically deny that they ever made such assertions to plaintiff.

Where the direct testimony of the parties is in conflict as to the issue of intent, the court may properly examine circumstantial evidence to resolve such conflicts. *See West v. Butler*, supra, and *Gavalik v. Continental Can Co.*, supra. The court will

examine circumstantial evidence as to motive and credibility in an attempt to determine whether the defendants engaged in prohibited conduct and, if so, whether they did so with the specific intent to interfere with plaintiff's statutory rights under Sec. 510 of ERISA.

## (A) Motive and Intent to Interfere

The court finds that the evidence of record fails entirely to suggest any motive for defendants to mislead or misinform plaintiff as to either the possibility of a plant closing or the likelihood that termination benefits would not be paid. First, the undisputed evidence suggest that each of the individual defendants were either friends of the plaintiff or had been on excellent working terms with him for years. Mr. Shaver testified that he and Mr. Ferrante were friends away from work, and that he attended Mr. Ferrante's retirement party. Mr. Poloni, the plant manager, stated that he knew Mr. Ferrante from Mr. Poloni's very first day of work, that they had bowled together and that at one point, they were friends in the same neighborhood. Mr. Fry, while not a friend of plaintiff, termed him a "dedicated employee." Mr. Ferrante offered no evidence to suggest that there had been a falling out among the four men, and admitted that, aside from the issues in dispute here, defendants had otherwise been fair to him in work-related matters.

Plaintiff also acknowledged that none of the defendants ever told him to retire, and further, that none of them ever told him that the plant would *never* close, but merely that a closing was unlikely in the near future. Moreover, Mr. Fry testified that he attempted to dissuade Mr. Ferrante from retiring in 1982, questioning whether the plaintiff could survive financially on a reduced pension and recommending that, if plaintiff was unsure as to whether to retire, that he should not do so. Mr. Ferrante disputed some details of the discussion, but generally confirmed its tone and content. And again, all of the individual defendants testified that plaintiff was either a good or exemplary employee during his tenure with International Salt.

In addition, Mr. Ferrante has failed to demonstrate any personal benefit to the individual defendants from the alleged misrepresentations. Mr. Shaver retired from International Salt in May, 1985, when the company was purchased by Crystal Mines, and worked for Crystal Mines for one year before being laid off and receiving termination pay. Mr. Fry testified that now works as corporate safety manager for International Salt and Mr. Poloni retired from International Salt in February, 1987, after 26 years of service, and is now employed by Crystal Mines. While Mr. Shaver received termination pay, he was only one of 25 to 27 employees to receive such benefits; Mr. Poloni never received any termination pay from the company.

Finally, plaintiff has failed to show that any of the individual defendants knew of the plant's closing plans prior to the last week of December, 1982, at least four months after plaintiff signed his retirement papers dated August 10, 1982. Mr. Poloni testified that he learned of the decision to close the plant from a corporate vice president during the last week of December, and Mr. Shaver stated that he was informed only one day prior to the January 14, 1983 shutdown.

The plaintiff has similarly failed to show any significant benefit to the corporate defendant by denying him termination pay. While it is true that International Salt has refused to pay the approximately $50,000 which plaintiff seeks, Mr. Fry testified that between 25 and 27 supervisory employees were paid termination benefits ranging from $25,000 to $50,000 each, after the plant closed. Mr. Poloni testified that *all* supervisors (other than Mr. Ferrante) were paid termination benefits and that a total of nearly $1 million in such pay was ultimately disbursed. When such testimony, uncontroverted by the plaintiff, is coupled with Mr. Ferrante's admission that the company had consistently provided him with all the other benefits to which he was entitled over a period of 36 years, the court must conclude that plaintiff has failed to demonstrate any credible motive whatsoever for any intentional interference with his

statutory rights, as protected by Sec. 510 of ERISA.

**(B) Credibility and Intent to Interfere**

As previously noted, the court, in attempting to resolve the sharp differences in the testimonial evidence, is compelled to consider carefully the circumstantial evidence, and especially that evidence relevant to the credibility of the parties' testimony.

Plaintiff contends that but for his misplaced reliance on the misrepresentations of the defendants, he would have continued to work at the Detroit plant until its closing in January, 1983. In light of all evidence at trial, the court finds plaintiff's claim is not credible.

First, Mr. Ferrante testified that he was increasingly disposed to retire early for reasons quite apart from any representations made by the defendants. As noted earlier, Mr. Ferrante cited as factors pushing him towards retirement, growing pressure to meet production quotas, his increasingly problematic ulcers, the possibility of a union strike and other pressures such as his windshield being broken and a physical attack on another supervisor.

Moreover, Mr. Fry provided significant undisputed testimony that Mr. Ferrante was seriously contemplating retirement well before June of 1982. Mr. Fry testified that the plaintiff had requested "the figures" on his retirement pension several times. Mr. Fry cited a request in July, 1981 for figures based on a retirement date of November 1, 1981 (Defendants' Exhibit B), and another request for figures based on a retirement date of November 1, 1982. Mr. Fry requested the computation for the latter date on April 15, 1982 (Defendants' Exhibit C) and received a memo from Susan Zenke, International Salt's director of human resources, detailing such figures on April 23, 1982 (Ds' Exhibit D).

In addition, the plaintiff's wife, Jean Ferrante, testified that plaintiff wanted to retire "because he couldn't take the pressure," and that she urged him instead to take a medical leave and seek counseling.

Plaintiff also testified that he sought the defendants' assistance in resolving his "confusion" over the fact that the salaried employees' Guide detailed termination pay benefits, while his annual benefits statements made no mention of such benefits. Here again, the overwhelming weight of the evidence suggests that plaintiff's claims of confusion cannot be credited.

Aside from the assertions by all the individual defendants that Mr. Ferrante never mentioned any confusion to them, plaintiff does not deny that he never raised his alleged confusion in his deposition testimony.

Moreover, Mr. Ferrante acknowledged that despite his indisputable anxiety over the subject of whether and when to retire, and his awareness of the company's "open door" policy regarding issues of concern to employees, he never raised his asserted confusion as to termination pay benefits with any corporate officers at a higher level than Mr. Poloni, the general manager. Mr. Ferrante admitted that he did not go beyond Mr. Poloni on this critical issue, despite the fact that he knew Mr. Theogard, the vice president for production in 1982; that his retirement benefits had been calculated and reported by Ms. Susan Zenke, the company's director of human resources; and that plaintiff considered the president of International Salt, Mr. Ryan, to be an old friend.

Plaintiff's failure to make further inquiry on this issue to knowledgeable officials who were easily accessible suggest either that his confusion was minimal or that such confusion did not play a significant role in his decision to retire in 1982. When plaintiff's admitted decision not to pursue this inquiry is taken together with his failure to raise the issue in his pre-trial deposition and the categorical denial by all three defendants that plaintiff ever raised the issue with them, the court can only conclude that Mr. Ferrante's asserted confusion with regard to the termination pay provisions is not credible, and that therefore plaintiff has not shown that he relied on any representation or omission by the defendants with regard to such benefits.

**IV.**

As noted earlier, the essential element of proof in establishing a claim of violation of

an employee's statutory rights pursuant to Sec. 510 of ERISA is specific intent to engage in prohibited conduct for the purpose of interfering with the attainment of any right to which the employee may become entitled. See *Gavalik v. Continental Can Co.*, supra, 812 F.2d at 852.

In the face of sharply conflicting testimonial evidence, and in the absence of "smoking gun" evidence, the court has relied on those facts which are undisputed and on circumstantial evidence of motive and credibility, and the court has concluded that plaintiff has failed to demonstrate a prima facie claim that he was denied any right protected by ERISA when the defendant corporation refused to pay him termination benefits after his voluntary retirement. Mr. Ferrante has failed to demonstrate, either directly or through evidence of illicit motive or conduct, that the defendants induced him to rely on inaccurate representations or that they otherwise discriminated against him by the failure to pay him termination benefits after his retirement on November 1, 1982.

Because plaintiff has failed to demonstrate either prohibited conduct or a specific intent to interfere with his statutory employment rights, it is hereby ordered that plaintiff's claim be, and hereby is, dismissed.

IT IS SO ORDERED.