Harold **WEST** et al., Trustees of the Southern Labor Union Welfare Fund and Pension Fund, Plaintiffs-Appellants,

v.

James **BUTLER** et al., Defendants-Appellees.

No. 78–1081.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 13, 1980.

Decided May 15, 1980.

Thomas Phillips, Phillips & Phillips, Oneida, Tenn., William Murphy Howard, Harlan, Ky., for plaintiffs-appellants.

E. H. Rayson, John B. Rayson, Knoxville, Tenn., Eugene Goss, Goss, Forester & Stephenson, Harlan, Ky., for defendants-appellees.

Before EDWARDS, Chief Judge, LIVELY, Circuit Judge, and PHILLIPS, Senior Circuit Judge.

PHILLIPS, Senior Circuit Judge.

The issue before the court on this appeal is whether the Employee Retirement Income Security Act of 1974[1] (hereinafter cited as ERISA) allows pension fund trustees to file civil actions to enjoin secondary picketing. We hold it does not and affirm the district court's order dismissing the suit.

## I

The plaintiffs-appellants are trustees of the Southern Labor Union (the union or SLU) Welfare and Pension funds. The funds were created pursuant to § 302(c) of the Taft-Hartley Act, 29 U.S.C. § 186(c), to receive contractually required pension and welfare contributions from employers with whom the union has collective bargaining agreements. Those employers are coal companies located in the Appalachian region of the United States.

---

1. Pub.L.No.93–406, 88 Stat. 829 (1974) (codified at 29 U.S.C. §§ 1001–1381).

Under the terms of the SLU's collective bargaining agreements, an employer's contributions to the welfare and pension funds are tied directly to its monthly coal production. For each ton of coal it produces, handles or processes, an employer must contribute 60¢ to the welfare fund and 20¢ to the pension fund. The contracts also provide that the per-employee monthly contributions cannot fall below $65 to the welfare fund and $30 to the pension fund. However, the appellants argue these minimums do not apply unless some coal is produced.

On December 6, 1977, the defendants-appellees, among others, allegedly began picketing some of the coal mines with which the SLU has collective bargaining agreements.[2] Most SLU miners refused to cross the picket lines. As a result, many of the mines cut back production drastically or ceased operations entirely during December, 1977.

Since fund contributions are tied to coal production, employer payments to the welfare and pension funds decreased dramatically during the picketing. Appellants estimate total contributions for the period were about $250,000 below normal.

On December 28, 1977, the appellants, as trustees of the SLU funds, filed this suit in the United States District Court for the Eastern District of Tennessee. Their complaint characterized the defendants' picketing as an illegal effort to interfere with SLU miners' right to protect their pension and welfare rights by working, a right appellants say is guaranteed by ERISA. They asked the court to enjoin the picketing and to require the defendants to reimburse the funds for $34,987.58 in lost contributions from the eight employers listed in the complaint.

On January 5, 1978, District Judge Robert L. Taylor dismissed the complaint for failure to state a cause of action under ERISA. Judge Taylor held:

The defendants could not interfere with any rights under this plan by preventing coal mining because, as plaintiffs admit, all rights under this plan are contingent upon work performed and assessments thereupon. . . . If no coal mining is performed, no rights under this plan are created. The fact that no contributions are due to the fund from employers for some period of time does not, in and of itself, violate rights under the plan, or under the Act. The plaintiffs have pointed to no authority nor legislative history indicating that Congress intended through the Act to prohibit the type of activity allegedly engaged in by the defendants.

The plaintiffs-trustees appeal.

## II

The trustees have based their suit on sections 511 and 502(a)(3) of ERISA, 29 U.S.C. § 1141 and § 1132(a)(3) respectively.

Section 511 makes it a criminal offense to interfere coercively with the exercise of rights protected by ERISA:

### § 511   Coercive interference

It shall be unlawful for any person through the use of fraud, force, violence, or threat of the use of force or violence, to restrain, coerce, intimidate, or attempt to restrain, coerce, or intimidate any participant or beneficiary for the purpose of interfering with or preventing the exercise of any right to which he is or may become entitled under the plan, this title, section 3001 [29 USC § 1201], or the Welfare and Pension Plans Disclosure Act [29 USC §§ 301–309]. Any person who willfully violates this section shall be fined $10,000 or imprisoned for not more than one year, or both.

(Sept. 2, 1974, P.L. 93–406, Title I, Subtitle B, Part 5, § 511, 88 Stat. 895.)

The trustees argue the appellees violated § 511 by engaging in violent secondary picketing for the purpose of[3] interfering

---

2. The purpose of the picketing is not clear. Appellants imply it was part of an effort by the striking United Mine Workers Union to shut down all the coal mines in the eastern United States. The validity of that disputed contention is irrelevant to our decision, however.

3. Given the trustees' suggestion that the appellees' conduct was secondary picketing designed

with SLU miners' ERISA-protected rights. Specifically, the trustees contend, ERISA protects the miners' contractual right to mine coal in order to obtain vested pension and welfare rights and in order to protect the financial integrity of the union's trust funds. Pointing out that ERISA contains other sections that deal with abuses by employers and fiduciaries, the trustees argue § 511 was enacted specifically to prevent coercive third-party interference with employees' rights. Thus, the trustees conclude, the appellees' coercive secondary picketing violated the clear language and intended spirit of § 511.

Assuming a violation of § 511, the trustees argue, § 502(a)(3) gives them a right to bring a civil action in the district courts to obtain equitable relief. Section 502(a)(3) provides:

§ 502. **Civil enforcement**

(a) A civil action may be brought—

\* \* \* \* \* \*

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan;

As pension fund trustees, the appellants are fiduciaries. *See* 29 U.S.C. § 1002(21). Furthermore, § 511 was enacted as part of Title I of ERISA and therefore is a provision "of this title". Consequently, the trustees urge that § 502(a)(3) gives them a right to sue to enjoin appellees' picketing and to obtain "restitution" of the $34,987.50 in lost employer contributions.

III .

■ A preliminary question for decision is whether § 502(a)(3) authorizes private civil actions to enforce § 511, which is, on its face, purely a criminal provision. We hold the trustees have no right to enforce § 511.

Section 511 is one of two provisions in ERISA which prohibit interference with protected rights. The other is § 510. Unlike § 511, which provides criminal penalties for violators, § 510 is a civil prohibition. We are cited to no court decision construing either section.

The statute's legislative history reveals that § 510 and § 511 are companion provisions. Section 510 prohibits interference with protected rights; § 511 provides criminal penalties where that interference is coercive:

*Interference with rights.*—Under the bill as passed by both the House and the Senate, it is unlawful to interfere with the attainment of any rights to which a participant or beneficiary may become entitled or to coercively interfere through the use of fraud, force, or violence with any participant or beneficiary for the purpose of preventing him from exercising any right to which he is or may become entitled to under the plan or title I. The penalties and degrees of proof for violations of the provisions are somewhat different. Under the conference agreement, the participant or beneficiary may bring a civil action against any person who interferes with his rights which are protected under the Act. In addition, any person who willfully uses fraud, force, violence or threats to restrain, coerce or intimidate any participant or beneficiary for purposes of interfering with the participant's or beneficiary's rights under the plan or title I of the Act is to be fined $10,000 or imprisoned for not more than 1 year, or both.

H.R.Conf.Rep.No.93–1280, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 5038, 5110.

That Congress intended § 511 coercive interference to be a subcategory of § 510 interference with protected rights was made clear by Senator Javits, speaking on behalf of the bill as reported out of the

to further the United Mine Workers' strike, it seems unlikely the trustees could establish the intent they allege. However, our holding that

secondary picketing does not violate ERISA makes it unnecessary for us to deal with the question of intent.

Senate Committee on Labor and Public Welfare:

> Every employee is to have the right, enforceable by the Secretary of Labor, to be free from interference with his pension benefits. This means that he cannot be discharged, fined, suspended, expelled or otherwise interfered with in order to prevent him from receiving pension benefits or attaining eligibility for pension benefits. *There are stiff criminal penalties if this type of interference takes the form of force, fraud or violence or threats of this nature.*

120 Cong.Rec. 29935, *reprinted in* Subcomm. on Labor, the Senate Comm. on Labor and Public Welfare, Legislative History of the Employee Retirement Income Security Act of 1974, Pub.L.No.93–406 (Comm.Print 1976) [hereinafter cited as Legislative History] at 4753 (emphasis supplied).

The interrelationship between § 510 and § 511 is carried over into their respective enforcement mechanisms. Section 510 provides:

**§ 510. Interference with rights protected under Act**

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this title, section 3001 [29 USC § 1201], or the Welfare and Pension Plans Disclosure Act [29 USC §§ 301–309], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this title, or the Welfare and Pension Plans Disclosure Act [29 USC §§ 301–309]. It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this Act or the Welfare and Pension Plans Disclosure Act [29 USC §§ 301–309]. *The provisions of section 502 [29 USC § 1132] shall be applicable in the enforcement of this section.*

(Sept. 2, 1974, P.L. 93–406, Title I, Subtitle B, Part 5, § 510, 88 Stat. 895.)

(emphasis supplied).

Section 510 thus provides in terms that it may be enforced by civil actions in the district courts. By contrast, § 511 contains only prohibitory language and a criminal penalty provision; it makes no reference to civil enforcement. Instead, § 504, 29 U.S.C. § 1134, charges the Secretary of Labor to investigate alleged ERISA violations, and § 506, 29 U.S.C. § 1136, requires the Attorney General to receive from the Secretary any evidence found in the investigation which suggests criminal prosecution is in order.

Congress' express provision for civil enforcement of § 510, coupled with its conspicuous failure to mention civil suits in § 511, suggests government filed criminal actions are the exclusive means of enforcing § 511. *Cf. Touche Ross & Co. v. Reddington,* 442 U.S. 560, 571–72, 99 S.Ct. 2479, 2486–87, 61 L.Ed.2d 82 (1979) (holding the existence of other sections explicitly providing for private damage actions indicates Congress did not intend to allow such actions under § 17(a) of the 1934 Securities Exchange Act). Such a construction would be at odds with the seemingly all inclusive language of § 502—authorizing civil suits "to enjoin *any act or practice* which violates *any provision of this title*"—if § 511 provided penalties for conduct not already prohibited by § 510.

The only reasonable conclusion, we hold, is that § 511 punishes coercive forms of conduct that violates § 510. Because § 511 is a criminal provision, its enforcement is the exclusive prerogative of the Attorney General. The trustees' § 502(a)(3) right of action, if one exists, is solely to enforce § 510. Their reliance on § 511 is misplaced.

### IV

■ The more important question before the court on this appeal is whether, assuming these defendants engaged in violent secondary picketing for the purpose of interfering with SLU miners' welfare and pension rights, the complaint states a cause

of action under ERISA. We are of the opinion it does not.

Congress had a specific type of problem in mind when it enacted sections 510 and 511:

> These provisions were added by the Committee in the face of evidence that in some plans a worker's pension rights or the expectations of those rights were interfered with by the use of economic sanctions or violent reprisals. Although the instances of these occurrences are relatively small in number, the Committee has concluded that safeguards are required to preclude this type of abuse from being carried out and in order to completely secure the rights and expectations brought into being by this landmark reform legislation.

S.Rep.No.93–127, 93d Cong., 2d Sess., *reprinted at* [1974] U.S.Code Cong. & Admin. News pp. 4838, 4872.

▮ The legislative history reveals that the prohibitions were aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights. Senator Hartke, speaking on behalf of his proposal that the Secretary of Labor be directed to establish administrative procedures for enforcing the provision that became § 510, made this clear:

> Most collective bargaining agreements protect employees against discharge without good cause and provide effective enforcement machinery in arbitration proceedings whose results are enforceable under section 301 of the Labor-Management Relations Act. But roughly half of all pension participants are not unionized and so they lack protection. Especially vulnerable are managers and executives whose substantial pension potentialities

provide an incentive to their discharge before vesting. The managers of the bill ought to think twice too. Discipline and discrimination can be so unpleasant as to amount to constructive discharge, a term used by the National Labor Relations Board. That can be the type of harassment which does not say that one is fired, but makes living such a hell that a person wishes he did not have to hang on and endure.

> In recognition of that problem, section 610 of S.4 as originally reported—made it illegal to "discharge, fine, suspend, expell [sic], discipline or discriminate" against plan participants to defeat rights under the act or a plan. The language parallels section 8(a)(3) of the National Labor Relations Act and should do the trick—but only if an adequate enforcement machinery exists.

119 Cong.Rec. 30374, *reprinted in* Legislative History at 1774–75. *See also* 119 Cong. Rec. 30044, *reprinted in* Legislative History at 1641 (Senator Javits explained that § 510 would prevent an employer from arbitrarily discharging an employee whose pension rights are about to vest). Thus, it appears Congress designed § 510 primarily to protect the employment relationship that gives rise to an individual's pension rights.[4]

Of course, an individual's employment relationship may be disrupted in a variety of ways. For example, a certified union might expel a member who alleges pension fund improprieties and then demand that he be dismissed under a union-shop agreement.[5] Indeed, the violation may be even more subtle; as Senator Hartke pointed out, discrimination may make an employee's work life so unpleasant as to amount to a constructive discharge. Regardless of its form, however, we conclude that discrimination, to violate § 510, must affect the individual's

---

4. In this connection, Senator Hartke's reference to § 8(a)(3) of the National Labor Relations Act is revealing. That section, 29 U.S.C. § 158(a)(3), makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment" in order to encourage or discourage membership in any labor organization.

5. Again, the National Labor Relations Act provides an analogy. Section 8(b)(2), 29 U.S.C. § 158(b)(2), makes it an unfair labor practice for a labor organization to "cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3)."

employment relationship in some substantial way.

Measured by this standard, the trustees' complaint does not state a cause of action. Its essential allegation is that the defendants picketed the SLU mines in order to undermine the plans' fiscal integrity. However, § 510 as we read it does not purport to protect the financial security of pension funds. Rather, the section is aimed solely at protecting individual rights.

Furthermore, we find no indication in either the statute or the legislative history that Congress intended § 510 to apply to secondary picketing. Unlike an individual's employer or union, secondary pickets are not in a position to disrupt the employment relationship directly. At most, they may be able temporarily to dissuade or perhaps prevent individuals from going to work. However, because secondary pickets cannot affect an employee's working conditions nor procure his dismissal, they do not pose the threat Congress sought to address when it enacted § 510. Nor, despite the trustees' contrary allegation in this case, can we conceive of any realistic set of circumstances that would give outsiders an incentive to engage in secondary picketing "for the purpose of" interfering with protected pension rights. If such a possibility exists, it certainly is far from what Congress had in mind when it considered these sections. We conclude § 510 was not intended to prohibit secondary picketing, and we decline the trustees' invitation to extend the statute beyond what we construe to be its intended bounds.

▪ Accordingly, we hold the trustees' suit was properly dismissed. Their reliance on § 511 fails because that section may be enforced only in a criminal proceeding instituted by the Attorney General. Treated as an effort to enforce § 510, the complaint does not state a cause of action. Section 510 neither guarantees the fiscal integrity of pension funds nor prohibits secondary picketing.

The district court was correct in dismissing the complaint, and its judgment is affirmed. No costs are taxed. Each party will bear its own costs on this appeal.