Oscar J. SWANSON, Plaintiff,

v.

U.A. LOCAL 13 PENSION PLAN, et al., Defendants.

Civ. No. 90–1308L.

United States District Court, W.D. New York.

July 12, 1991.

Margaret A. Clemens, Nixon, Hargrave, Devans & Doyle, Rochester, N.Y., for plaintiff.

Robert T. DiGuilio, Osborne, Reed, Van de Vate, Burke & Tobin, Rochester, N.Y., for defendants.

## DECISION AND ORDER

LARIMER, District Judge.

This is an action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and § 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186. Defendants have moved in the alternative to dismiss the complaint for failure to state a claim, Fed.R.Civ.P. 12(b)(6), or for summary judgment pursuant to Fed.R.Civ.P. 56.

### Background

The facts as viewed in the light most favorable to plaintiff, the non-moving party, are as follows. Oscar J. Swanson ("Swanson") was born in 1917, and has been a pipefitter and welder for some fifty years. He is a participant in U.A. Local 13 Pension Plan ("the Plan"). In April 1986 he went to the office of defendant Gary Romano ("Romano"), the plan administrator, in order to talk about Swanson's "employment options." Swanson claimed that at the time of his visit he was upset and agitated because he had just had an argument with one of his supervisors.

Romano explained to Swanson that he could retire and either receive full benefits for himself in a monthly payment or receive a reduced monthly benefit, with a death benefit for a designated beneficiary.

According to Swanson, Romano "encouraged" him to sign the retirement papers at that first meeting. Swanson has never specified precisely how Romano did so in either the complaint or by affidavit in opposition to the summary judgment motion.

Romano stated in an affidavit that Swanson came to his office on April 10 or 11 and told Romano that he wanted to retire effective May 1, 1986. According to Romano, Swanson did not ask him whether or not he

should retire, nor did Romano tell him that he should or encourage him in any way to retire. Romano states that Swanson did not appear upset or angry, and that he appeared to have no trouble hearing what Romano was saying. Romano states that he obtained certain information from Swanson, but that Swanson did not sign any papers on that day. Instead, according to Romano, he told Swanson that he would forward the necessary papers to Swanson for review and signature.

There is no suggestion that Swanson asked for information from Romano and received erroneous information.

Swanson claims that Romano never volunteered information that once he retired, his benefit formula would be calculated according to the rate in effect as of the date of retirement and that Romano never told him that he could not reconsider his decision to retire once the Trustees of the Plan had approved his application. Swanson's own allegations are unclear concerning exactly what forms he signed, or when he signed them. According to Romano, on April 10, the same day he talked to Swanson, he mailed Swanson a cover letter together with two forms: a Request for Pension Benefit Data Form, and a Benefit Election Form. Romano states that Swanson returned them to his office signed and completed on April 14.

The form entitled "U.A. LOCAL PENSION PLAN—FORM OF BENEFIT ELECTION" stated that Swanson's "Requested Date of Retirement" was May 1, 1986. The form also stated:

I understand that once my retirement application is approved by the Trustees, the Form of Retirement I have selected can *never* be changed. [Emphasis in original.]

I also understand that the Form of Retirement that I have originally selected will remain the same in the event I return to work and re-retire in the future.

I further understand that I cannot work at this industry and receive a monthly pension check if the work is performed in the same trade, craft, or geographical location.

Over two months later, on June 19, 1986, the Board of Trustees approved Swanson's application for benefits.

Although retired, Swanson could perform some work in the industry and still receive his full pension benefits. Under the Plan, Swanson could receive his full monthly benefit check unless he worked more than 40 hours per month in the industry.

From April 1986 to January 1987, Swanson never worked more than 40 hours in any single month. Swanson did not work at all in April or May 1986. He worked 24 hours in June, 39.75 hours in July, 25.25 hours in August and 8 hours in September, 1986. Swanson did not work any hours in October or November 1986, but in December and in January 1987 he worked 39.75 hours, the maximum amount allowable under the Plan so as not to jeopardize his monthly benefit payment.

At some point, after the Trustees had approved Swanson's retirement application, Swanson claims that he notified defendants that he no longer wished to be considered retired. Neither the complaint nor Swanson's papers in opposition to the summary judgment motion state precisely when this occurred.

The office manager in Romano's office states in an affidavit that Swanson appeared in the office in either December 1986 or January 1987 complaining that he was not told certain information and at that time Swanson ripped up several of his retirement checks.

It is not disputed that Swanson's first written notification to the trustees of the Plan that he intended to return to work full time was contained in a letter dated January 22, 1987 which Swanson signed in Romano's office. That letter stated that he would "return to work at the plumbing trade Feb[ruary] and will therefore not be entitled to receive pension checks."

Swanson allegedly told Romano in 1987 that he would pay back any pension benefits he had received, but Romano replied that plaintiff had to "live with" his decision. Swanson did not receive any checks

beginning in September 1987, apparently because he worked more than forty hours a month for three consecutive months, and was therefore ineligible for benefits. *Id.* In addition, Swanson wrote to the Fund's Benefits Office Manager in August 1987, telling her that he "went back to work as [of] 1st of August ... Tell G. Romano that I'm working." *See* Defendants' Ex. "F".

On March 3, 1988, after noticing that Swanson had not worked for a number of months, Romano wrote to him to inform him that if Swanson had in fact ceased working, he was required to reapply for benefits in order to begin resumption of his pension checks. Swanson did not do so, but in April 1990, he began receiving retirement benefits from the Plan as required by the Internal Revenue Code because he had reached age 70½. These checks were required to be issued regardless of whether Swanson was working.

Because Swanson's benefits were calculated based on a 1986 retirement date, he receives $43 per month for each year of credited service ($875 total per month), instead of the $65 per month for each year of service that he would get if he retired now ($1500 per month total).

Swanson does receive some credit for his years of employment subsequent to his signing the retirement papers. When Swanson re-retires, his benefits for that second period of employment will be calculated at the rate which is in effect when he re-retires. However, because of Plan rules concerning re-employment following retirement, only his benefits for post–1986 employment will be calculated at that higher rate. His benefits for his employment up until his first retirement in May 1986 will continue to be calculated at the rate which was in effect in 1986.

### The Complaint

The complaint contains seven counts. Count I is based on defendants' alleged breach of their duty under 29 U.S.C. § 1022 to provide Swanson with an adequate summary plan description, thereby causing him to sign the retirement papers without understanding the consequences of his act.

Count II alleges defendants' breach of their fiduciary duty to Swanson as a Plan participant, which duty Swanson claims was particularly high in his case because he allegedly suffers from a hearing loss. In Count III, plaintiff alleges that defendants breached a "higher duty of care" which they voluntarily assumed by going beyond their role as advisors and improperly encouraging him to retire on account of his age.

In Count IV, Swanson requests benefits under the Plan as he interprets it. Specifically, plaintiff claims that he does not meet the Plan's definition of a retiree, because he did not "withdraw completely from the industry." Count V alleges defendants' violation of 29 U.S.C. § 1140, which prohibits discrimination against a plan participant for the purpose of interfering with his attainment of rights under the Plan.

Count VI requests attorney's fees and costs. Count VII alleges defendants' violation of their duty under LMRA to use the Plan solely for the benefit of employees.

Premised on these claims, Swanson seeks the following relief: rescission of his 1986 "retirement"; a declaration that his benefits are to be calculated as of date he "actually" retires (probably in 1991 or 1992); an award of past benefits under the Plan, "as properly calculated"; $355,000 damages for pain and suffering resulting from Swanson's distress over his loss of benefits; and attorney's fees and costs.

In support of their motion, defendants contend that Swanson did in fact retire in 1986, and that he has gotten all the benefits to which he is entitled. Defendants also raise specific arguments with respect to each count, which will be discussed in detail below.

Defendants have also moved to strike plaintiff's demand for a jury trial. Defendants argue that, assuming their motion to dismiss Count VII is granted, Swanson has no basis for seeking a jury trial, since ERISA claims are equitable in nature. Finally, defendants contend that the claims against the individual Plan trustees should

be dismissed because there are no allegations against those defendants.

## Discussion

### 1. The Legal Standard

Defendants have moved in the alternative to dismiss or for summary judgment. Fed.R.Civ.P. 12(b)(6), 56. Because the parties have submitted matters outside the pleadings, I will treat the motion as one for summary judgment. *Nat'l Ass'n of Pharmaceutical Mfrs. v. Ayerst Lab.*, 850 F.2d 904, 911 (2d Cir.1988).

Rule 56 provides that summary judgment may be granted only when "there is no genuine issue as to any material fact ..." A party moving for summary judgment must therefore establish that the record as a whole, viewed in the light most favorable to the non-moving party, could not lead a rational factfinder to find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The party seeking summary judgment bears the initial burden of showing that there are no relevant facts in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), and must "point to an absence of evidence to support an essential element of the non-moving party's claim." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir.1988). However, once the movant has done so, the nonmoving party must go beyond the pleadings and designate specific factual issues through affidavits, depositions, answers to interrogatories, or admissions on file. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

### 2. The Summary Plan Description

ERISA requires that participants in a benefits plan receive a summary plan description outlining, *inter alia*, the plan's requirements concerning eligibility for participation and benefits and circumstances which could result in a denial or loss of benefits. 29 U.S.C. § 1022. If the description does not adequately inform an employee of his rights under the plan, the employee may bring a civil action against plan fiduciaries for any damages that result from their failure to disclose. 29 U.S.C. §§ 1001(b), 1132(a)(1)(B).

Defendants' alleged breach of these disclosure requirements forms part of the basis of both Count I and Count IV. In Count I, Swanson alleges that the Plan Summary was inadequate because it did not inform him of the consequences of signing retirement papers when he did. More particularly, Swanson alleges that the summary failed to inform him what constituted "retirement" under the Plan, that signing retirement papers would affect the calculation of his benefits, and how and when he could change a decision to retire. Plaintiff also claims that the Plan description should have advised him "to take enough time and consider other alternatives to be sure he wanted to retire" in 1986. Plaintiff's Statement of Material Facts in Dispute p. 2.

In Count IV, Swanson alleges that he has not retired under the terms of the Plan because he did not "withdraw completely from employment in the industry ..." In part, Swanson's interpretation of the Plan in this regard is based on his contention that the Plan is unclear regarding the calculation of benefits, and that its terms should therefore be construed against defendants.

In addition, Swanson maintains that he constructively withdrew his request to retire by accepting employment after he signed the papers but before the Trustees approved his application. Plaintiff also claims that under the Plan, he could "withdraw" his retirement application even following Trustee approval in the event of his "reemployment in the industry," which he claims occurred in his case.

In response, defendants contend that ERISA does not require summary plan descriptions to include the information which Swanson alleges was omitted from or inadequately explained in his Plan Summary. Defendants also argue that even if these items are required by ERISA, plaintiff's claims relating to the Plan Summary should be dismissed because the items

were in fact addressed in the summary given to Swanson.

### The Plan Summary

Before the court addresses these contentions, a review of the relevant provisions of the Plan Summary is needed.

The summary informed participants that "You are eligible to retire on a normal retirement pension at any time you wish after you have reached age 65 and completed at least five (5) Years of Service." Plan Summary p. 11. It further stated that "You must file a written application on forms provided at the Fund Office before any pension will be paid." *Id.* at 21.

The Plan Summary warned participants that "You *cannot* change the form of pension that you selected after your pension payments have commenced," and that

> [y]ou cannot reject your pension after your application has been approved by the Trustees. A participant shall be allowed to withdraw his application for pension benefits, on forms provided, prior to Trustee approval thereof. However, if approval of the application has occurred, benefit payments may not be later rejected by the participant except in the event of re-employment in the industry as provided on page 33.

*Id.* at 17 (emphasis in original).

On page 33, a provision entitled, "RETIREMENT DEFINED; RE–EMPLOYMENT OF RETIRED EMPLOYEES," stated as follows:

> To be considered retired under the U.A. Local 13 Pension Plan, you must withdraw completely from employment in the industry within the geographic area of Local 13. You will not be entitled to a monthly pension for any month during which you are re-employed for 40 or more hours of work.
>
> If you retire on pension and later return to work, upon subsequent retirement you are entitled to a pension equal to the pension you were receiving before your retirement; and, if you are credited with at least 1,000 Hours of Service during the first year of your re-employment and you do not already have 30 years of

Credited Service, you are also entitled to a pension based on the period of re-employment. Credit for the period of re-employment would be limited so that your total Credited Service would not be more than 30 years. This additional pension is calculated on the benefit formula in effect at the date of reapplication for benefits.

*Id.* at 33.

The Plan Summary also informed participants how their benefits would be calculated. For a normal retiree, the plan stated that "your monthly pension is the monthly unit of benefit in effect on the date your pension starts times your years of Credited Service, with a maximum of 30 years of Credited Service." *Id.* at 12–13. A table outlining the monthly units of benefit applicable to different types of retirees showed that the benefit rates had increased substantially over the years. *Id.* at 40–41.

The Plan Summary contained several provisions governing a "break in service," which was defined as occurring when an employee had two consecutive "break years," or years in which he had less than 81 hours of service. *Id.* at 22. The summary stated that the effective date of a break in service was "the first day of the next month following your last hours worked in Covered Employment, provided that two consecutive Break Years have occurred." *Id.* The summary advised participants that "This effective date is important to you because it determines your monthly unit of benefit used in calculating your benefit earned up to the effective date of your Break in Service." *Id.*

As an example, the summary said that if the participant had twenty-three years of credited service, followed by a three-year break in service, and he then returned for another fourteen years of credited service, his service for purposes of calculating benefits

> would be composed of two periods, the first period consisting of 23 years, and the second period of 14 years. However, you cannot have more than a maximum of 30 years. Since the benefit formula is

higher during your last 14 years, you will receive full credit for those 14 years, and your first period of service will be reduced to 16 years so that your total period of Credited Service is limited to the maximum of 30. Your monthly pension would be:

| | |
|---|---|
| 16 years × $5.25 (formula in effect 1/1/70) = | $ 84.00 |
| 14 years × $37.00 (formula in effect at retirement = | 518.00 |
| Total monthly pension = | $602.00 |

### Summary Judgment

After reviewing the record, I find that defendants are entitled to summary judgment on Counts I and IV. The Plan Summary adequately apprised Swanson of the consequences of his decision, and Swanson has not shown that he was affirmatively misled by the summary or by Romano.

■ Although ERISA's disclosure requirements are meant to ensure that participants fully understand their rights and obligations, a Summary Plan description need not set forth in extensive detail every circumstance which might affect an employee's benefits, or to provide personalized attention to individual employees. *See Morse v. Stanley*, 732 F.2d 1139, 1147–48 (2d Cir.1984); *Pompano v. Michael Schiavone & Sons, Inc.*, 680 F.2d 911, 914 (2d Cir.1982), *cert. denied*, 459 U.S. 1039, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982). The question is simply whether the Plan Summary "reasonably apprise[s] ... participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a)(1).

■ Count I alleges that the Summary Plan description inadequately advised Swanson that his benefits would be reduced "if he signed retirement papers, but continued to work in the industry ..." However, the Plan description in fact is far clearer than plaintiff contends. The summary informed Swanson that to receive a pension, he was required to fill out an application, which he did. Any doubt that receipt of a pension implied retirement was removed by the summary's frequent references to pension benefits "for retirement" and "retiring on a pension." *See, e.g.*, Plan Summary at pp. 10–12, 21, 25, 33. The documents signed by Swanson also ex-

pressly stated that he intended "to officially retire" on May 1, 1986. *See* Defendants' Ex. "D". Thus, plaintiff clearly knew that he was applying for benefits to commence upon his retirement in May.

The Plan Summary also explained that if Swanson changed his mind about retiring, he could withdraw his application in writing at any time prior to Trustee approval, which occurred on June 19. Thus, Swanson had some two months within which to withdraw his application for retirement. Swanson, however, waited until January 1987—seven months after the Trustees had approved his application to notify the Plan of his change of heart.

■ Swanson's argument that he "constructively withdrew" his pension application by returning to work is not persuasive. Plaintiff makes much of the fact that the Plan Summary states that an employee must "withdraw completely from employment in the industry" to be considered retired. Swanson contends that he therefore could not have been considered retired in June 1986, when his application was approved, because he had begun working again.

This argument, however, takes the summary's definition of retirement out of context. The entire paragraph states: "To be considered retired under the U.A. Local 13 Pension Plan, you must withdraw completely from employment in the industry within the geographic area of Local 13. *You will not be entitled to a monthly pension for any month during which you are re-employed for 40 or more hours of work.*" (Emphasis added.) Thus, the summary implicitly permitted an employee to work less than forty hours a month and still be considered "completely" withdrawn from employment. The fact that Swanson worked less than 40 hours per month after April 1986 is entirely consistent with the Plan and with Swanson's stated intent to retire. The Plan specifically allowed for such brief periods of employment and this allowed employees to supplement their retirement checks with minimal employment. The fact that Swanson worked 24 hours in June 1986, and 39.75 hours in July 1986 is not

inconsistent with his decision to retire and certainly cannot be considered any type of "constructive" withdrawal of his retirement application.

Swanson's time records also reinforce the conclusion that it was not until 1987 that he changed his mind about retirement. Although Swanson worked during six of the eight months from June 1986 to January 1987, in none of those months did he work more than forty hours. Moreover, in three of those months he worked 39.75 hours—the most he could have worked without losing his benefits for that month. In February 1987 (the month following the first written statement from Swanson that he was returning to work), Swanson worked 266 hours. Defendant's Ex. "G". This strongly suggests that Swanson was not misinformed or unaware of the relationship between hours worked and retirement benefits, but that he knew and understood that he remained "retired" so long as he worked less than forty hours a month.

■ It should also be noted that plaintiff does not allege that defendants made representations to him which were in any way contrary to the Plan Summary. In fact, Swanson's vague allegations concerning what he was told by Romano concentrate more on what Romano did *not* say than on what he did say. For example, plaintiff alleges that "Romano also failed to inform plaintiff that his decision to retire could not be changed to the extent that if he returned to work following the signing of the papers, his benefits would be calculated at a rate which was in effect in 1986 ..." Complaint p. 4. Nowhere, however, does the complaint allege that Romano affirmatively misled Swanson. *Cf. Bower v. Bunker Hill Co.*, 725 F.2d 1221, 1224 (9th Cir.1984) (summary judgment inappropriate where factual questions existed regarding whether management made representations contrary to terms of plan).[1]

Furthermore, many of the matters which Swanson claims Romano should have disclosed to him, such as the method of calculation of retirement benefits, were adequately explained in the Plan Summary, and there was therefore no need for Romano to go over those provisions again. It is true that when an employee *requests* information, a plan administrator may have a duty not only to refrain from misinforming the employee, but to provide complete and correct information. *See, e.g., Eddy v. Colonial Life Ins. Co.*, 919 F.2d 747, 750 (D.C.Cir.1990). Here, however, Swanson has alleged only that he went to Romano "to discuss his employment options." Complaint p. 4. He does not claim that he asked Romano any specific questions which Romano did not fully or accurately answer.[2]

■ Other alleged omissions in the Plan Summary and in what Romano told Swanson relate to matters which are simply not required by ERISA. For example, there is no support for plaintiff's contention that the summary should have advised him "to take enough time and consider other alternatives to be sure he wanted to retire then," or that Romano should have advised him to consider waiting until September 1986 to see whether the benefit rate would go up.[3] "To require ERISA summary plan

---

1. Since the court finds no violation of 29 U.S.C. § 1022, it is unnecessary to consider defendants' argument that Swanson must show that he relied on the allegedly misleading provisions. The Second Circuit has not yet decided whether detrimental reliance upon a faulty summary is a prerequisite to recovery under § 1022. *See Howard v. Gleason Corp.*, 901 F.2d 1154, 1160–61 (2d Cir.1990).

2. To the extent that these facts are unclear, the fault lies with Swanson himself. Defendant Romano has submitted an affidavit setting forth in some detail the conversation which he had with Swanson in April 1986. It is plaintiff's burden, therefore, to show the existence of specific fac-

tual issues. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Swanson's recitation of what Romano did *not* say to him is not sufficient to meet that burden.

3. It should also be noted that the Plan Summary, which was effective as of January 1, 1984, shows on pages 40–41 that the benefit rates had consistently increased over the years preceding Swanson's decision to retire in 1986. In fact according to the Plan, benefits had increased virtually every year since 1978. Thus, Swanson clearly had reason to know that a benefit increase the following year was possible, or even likely.

descriptions to include accurate and complete information about all of the different factual settings in which a given pension plan rule might apply would lead to the promulgation of 'summaries' many pages in length, perhaps even longer than the plan itself, that would be of no use to the ordinary employee." *Stahl v. Tony's Bldg. Materials, Inc.*, 875 F.2d 1404, 1409 (9th Cir.1989), *citing Pompano*, 680 F.2d 911, 914.

For many of these reasons, summary judgment is also granted on Count IV, which concerns whether or when Swanson met the plan's definition of retirement. Swanson contends that defendants wrongly interpreted the Plan in deciding that he had retired.

■ Defendants' application of the Plan in this regard is subject to *de novo* review. In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* 109 S.Ct. at 956. This rule requires *de novo* review in the case at bar, since the Plan Summary does not leave decisions concerning the calculation of benefits and effective dates of retirement to the discretion of the plan administrator. Instead, the summary provides mathematical formulae for determining the amount of benefits, and speaks in terms of benefits to which employees *"are* entitled" if they retire and then return to work (emphasis added). This categorical language indicates that these matters are not left to the discretion of the plan administrator. *See Heidgerd v. Olin Corp.*, 906 F.2d 903, 908–09 (2d Cir. 1990).

■ As already explained, however, Swanson did meet the requirements for retirement in June 1986. He was old enough, had enough years of service, and had submitted the necessary paperwork. For the next several months, he never worked more than forty hours in a given month. Only in 1987 did he indicate a desire to return to work. His situation at that time was properly governed by the Plan provisions relating to reemployment, and his subsequent benefits were calculated in accordance with the Plan Summary.

Swanson's chief argument in support of Count IV is that he continued to be employed in the industry after signing the benefits application. The fact that he continued to work is of no consequence because the Plan specifically provided that a retiree could work and receive benefits as long as he worked less than 40 hours a month.

This was not a case involving a break in service. That is covered in the Plan at pages 22–24. Retirement is defined at page 33 and is discussed throughout the Plan Summary. All of the papers signed by Swanson were retirement papers. What affected Swanson was his election to retire as indicated by his oral and written request as well as his receipt, for several months, of retirement benefits.

### 3. Defendants' Fiduciary Duty

Counts II and III allege that defendants breached their fiduciary duties to Swanson in a number of ways, most of which revolve around defendants' alleged failure to give Swanson adequate advice and information about his retirement options. Plaintiff also claims in Count II that his hearing loss increased the standard of care which defendants owed him, and in Count III that "defendants voluntarily assumed a higher fiduciary duty of care" by "stepping outside the bounds of the usual role when an employee seeks advice and improperly encouraging plaintiff to retire because of his age ..."

■ First of all, it is not clear what plaintiff's alleged hearing loss has to do with any issue in this case. There is no claim that Swanson failed to hear something that was said to his detriment.

It is not clear from Swanson's papers whether he asserts that the court should impose a higher standard of care on defendants as a matter of law, but if that is his position, he has cited no authority to sup-

port it. ERISA nowhere sets forth any "higher fiduciary duty" or "higher standard of care" based on a participant's mental or physical state. At any rate, however, Swanson has simply not shown any violation of defendants' fiduciary duty.

ERISA does impose a duty upon fiduciaries to act in the interest of plan participants. 29 U.S.C. § 1104. That duty includes correctly and adequately informing participants about their rights and obligations under the plan. 29 U.S.C. § 1022; *Chambless v. Masters, Mates & Pilots Pension Plan,* 602 F.Supp. 904 (S.D.N.Y.1984), *aff'd,* 772 F.2d 1032 (2d Cir. 1985), *cert. denied,* 475 U.S. 1012, 106 S.Ct. 1189, 89 L.Ed.2d 304 (1986). However, Swanson's claims in this regard largely repeat the allegations of Counts I and IV relating to the advice which defendants gave, or failed to give, Swanson. As the discussion of Counts I and IV makes clear, these claims are not supported by the record. There is no evidence that defendants misinformed or misled Swanson.

Plaintiff's vague allegations that defendants failed to "give him adequate time and space to consider the consequences of his decision" and that they "accept[ed] his signed retirement papers, knowing that plaintiff was in a distraught and agitated state and that such a major decision could and should be postponed until he was able to reflect on his decision" are insufficient to establish any genuine issues of material

fact. Plaintiff claims not so much that defendants misled him, but that they failed to make sure that he was making a wise decision after careful reflection.

■■■■ In effect, plaintiff would impose a duty upon plan fiduciaries to refuse to accept an application for pension benefits until the fiduciaries had discussed the participant's decision with him at great length and in detail. To require fiduciaries to protect participants from the consequences of their own actions in this way would go well beyond ERISA's directive that fiduciaries act "solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants." 29 U.S.C. § 1104(a)(1)(A)(i).[4]

In any event, the Plan itself provides a type of cooling-off period since it allows the employee to withdraw his retirement application at any time before the trustees approve his request. In Swanson's case, it was *two months* after he initially signed the retirement papers before the trustees approved his application. Even a casual reading of the Plan would have alerted Swanson to the fact that he could have withdrawn his application prior to the trustees' vote if he had second thoughts.

### 4. The "Discrimination" Claim (Count V)

Count V alleges defendants' violation of § 510 of ERISA, 29 U.S.C. § 1140, which

---

**4.** Although the dismissal of Counts II and III renders moot Swanson's claims for damages for pain and suffering, these claims would have to be dismissed in any event. In *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), the Supreme Court held that extracontractual damages are not available in suits under 29 U.S.C. § 1109. Although the Court expressly limited its holding to § 1109, 473 U.S. at 139 n. 5, 105 S.Ct. at 3088 n. 5, and the Second Circuit has not yet decided whether extracontractual damages are recoverable under § 1132(a), virtually every other Circuit, usually relying on the logic of *Russell,* have held that they are not. *See McRae v. Seafarers' Welfare Plan,* 920 F.2d 819, 821 (11th Cir.1991); *Reinking v. Philadelphia American Life Ins. Co.,* 910 F.2d 1210, 1219 (4th Cir.1990); *Pane v. RCA Corp.,* 868 F.2d 631, 635 n. 2 (3d Cir.1989); *Drinkwater v. Metropolitan Life Ins. Co.,* 846 F.2d 821, 825 (1st Cir.1988), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988);

*Sage v. Automation, Inc. Pension Plan and Trust,* 845 F.2d 885, 888 n. 2 (10th Cir.1988); *Sokol v. Bernstein,* 803 F.2d 532, 534 (9th Cir.1986); *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.,* 793 F.2d 1456, 1462–64 (5th Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837, and 479 U.S. 1089, 107 S.Ct. 1298, 94 L.Ed.2d 154 (1987); *Varhola v. Doe,* 820 F.2d 809, 817 (6th Cir.1987); and *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1216 (8th Cir.1981), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 and 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981). Post–*Russell* district court case law from the Second Circuit accords with this view. *See, e.g., Lawford v. New York Life Ins. Co.,* 739 F.Supp. 906, 914 (S.D.N.Y.1990); *Giuntoli v. Garvin Guybutler Corp.,* 726 F.Supp. 494, 509–10 (S.D.N.Y.1989). In the face of this overwhelming authority, Swanson's request for extracontractual damages on his ERISA claims could not stand.

makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan ..." Defendants contend that this claim should be dismissed because § 1140 does not apply to non-employer defendants.

There is some dispute among the courts over whether § 1140 liability is limited to employers. In *Vogel v. Independence Federal Savings Bank*, 692 F.Supp. 587 (D.Md. 1988), an action against an insurer for wrongful interference with the attainment of medical benefits, the court stated that although § 1140 is most commonly applied when an employer wrongfully terminates a worker to prevent his pension rights from vesting, "the language of the statute cannot be read so as to limit its application solely to those situations," and that accordingly "[t]he section ... cannot be limited solely to suits against employers." *Id.* at 593. *See also Boesl v. Suburban Trust & Sav. Bank*, 642 F.Supp. 1503, 1513–14 (N.D.Ill.1986) (§ 1140 imposes liability on any "person" that interferes with employee benefit rights, whether that "person" is an individual, corporation, or fiduciary).

However, the court in *Rollo v. Maxicare of Louisiana, Inc.*, 698 F.Supp. 111 (E.D.La.1988), expressly rejecting *Vogel*, denied a motion for leave to amend a complaint to add a cause of action under § 1140 against a doctor and a health maintenance organization which administered an employee health care plan. The court held that § 1140 was not intended to apply to non-employers, since the policy thrust of the statute targets the employment relationship out of which employee benefits arise, and because the section "speaks of conduct which, functionally, can only be completed by one who is an employer of the aggrieved person." *Id.* at 114.

In support of its holding, the *Rollo* court relied on *West v. Butler*, 621 F.2d 240 (6th Cir.1980), in which the court affirmed a dismissal of a claim by pension fund trustees who sought to enjoin the defendants from picketing coal mines with which the fund had collective bargaining agreements. Since many employees refused to cross the picket lines, mine production fell, and the fund contributions, which were tied to coal production, also dropped. The plaintiffs argued that the defendants were interfering with the miners' right to mine coal in order to obtain vested pension rights. Holding that the plaintiffs had not stated a cause of action under § 1140, the court said that the statute was "aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *Id.* at 245. The court concluded that to violate § 1140, discrimination must substantially affect the employment relationship that gives rise to an individual's pension rights. *Id.* at 245–46.

Nevertheless, the court in *West* did not hold that § 1140 applies only to employers. In fact, observing that "an individual's employment relationship may be disrupted in a variety of ways," the court stated that a union could be liable if it expelled a member who had alleged pension fund improprieties and then demanded that he be dismissed under a union-shop agreement. *Id.* at 245. The court found § 1140 inapplicable to picketers, however, since, unlike an employer or union, picketers are not in a position to disrupt the employment relationship directly, but at most might temporarily dissuade or prevent employees from going to work. *Id.* at 246.

The import of *West*, therefore, is not that only employers may be liable under § 1140, but that § 1140 only reaches conduct which fundamentally changes the employer-employee relationship so as to interfere with pension rights. Case law from other Circuits also supports this view. *See, e.g. Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111 (2d Cir.1988) (citing *West*);[5] *Deeming v. American Standard, Inc.*, 905 F.2d 1124, 1127 (7th Cir.1990).

---

**5.** The court in *Dister* did state that a § 1140 claim requires proof that "an employer" was at least partially motivated by the specific intent to engage in activity prohibited by the statute, *id.* at 1111, but since the defendant in *Dister* was an

As the court pointed out in *West*, employers are not the only persons or entities capable of affecting the employment relationship in this way. 621 F.2d at 245. Moreover, the statute's reference to "any person" appears, at least at first glance, to be all-encompassing.

■ That does not mean, however, that every type of entity can be held liable under the statute, and I find that a pension plan is *not* a proper defendant under § 1140. ERISA expressly defines the term "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization." 29 U.S.C. § 1002(9). Pension plans are conspicuously absent from this list.

Noting that absence, the court in *Adams v. Koppers Co.*, 684 F.Supp. 399 (W.D.Pa. 1988), held that a plan was not a proper defendant under § 1140. The court stated that the "legislative history indicates that § 1140 was directed at employment decisions, which would not normally be under the control of the plan. We find no indication that the exclusion of plans from the definition of 'person' in § 1002(9) was unintentional." *Id.* at 401.

I find the reasoning of *Adams* persuasive. The court cannot ignore the statutory definition of "person," and Swanson's § 1140 claim against the Plan itself must therefore be dismissed as a matter of law.

■ I also find that although individuals may be liable under § 1140, the individual defendants in this case are entitled to summary judgment in their favor, because plaintiff's factual allegations, even if true, would not support a finding of liability.

Individuals are included in the definition of "person" in § 1002(9), but as the *West* decision indicated, § 1140 only reaches conduct which directly alters the employer-employee relationship in a fundamental way. I find, therefore, that individuals may be named as defendants in a § 1140 claim, but only if their alleged activity has

directly and fundamentally altered the plan participant's employment relationship so as to interfere with his pension rights. This approach, I believe, strikes a balance between the statutory definition of "person" in § 1002(9) and the focus of § 1140 on a defendant's conduct. *See Adams*, 684 F.Supp. at 402 (plan administrator can be held liable under § 1140, although such a case would be rare, since few plan administrators have authority to discharge employees or take any other of the actions proscribed by § 1140).

■ The factual basis for Count V is that defendants encouraged Swanson to retire "without properly advising him as to all of his options and the full consequences of retiring in 1986, but continuing to work in the industry ..." As stated with regard to the ERISA claims, these allegations are unsupported by the record. Even if they were true, however, defendants did not directly and substantially alter Swanson's relationship with his employer in the way that § 1140 was intended to prevent.

Arguably, of course, persuading a participant to retire does alter the employer-employee relationship in the sense that the participant changes from an employee to a retiree. Nevertheless, defendants' alleged conduct did not amount to the kind of direct interference in the employment relationship that is required to establish liability under § 1140. The most common basis for a § 1140 claim is the discharge of an employee. As the *West* court pointed out, there are other ways to disrupt that relationship, but it is notable that the examples given by the court—harassment amounting to constructive discharge and expulsion of a union member who works under a union-shop agreement—are functionally identical to discharge. All these types of conduct, as well as the conduct specifically proscribed by the statute, *i.e.*, "to discharge, fine, suspend, expel, discipline, or discriminate" against a participant, connote some type of coercion or unilateral action by the employer.

employer, this statement should not be read to mean that only employers may be liable.

The court in *Goins v. Teamsters Local 639*, 598 F.Supp. 1151 (D.D.C.1984), found no cause of action under § 1140 based on allegations that a union's business agent made false statements to an employee concerning his pension rights. At most, the court said, the agent's remarks could have lulled the employee into erroneously believing that certain requirements did not apply to him. The court noted that such statements stood "in stark contrast" to the sort of discrimination found in cases enforcing § 1140, which usually involve employers discharging or taking reprisals against employees to prevent them from receiving benefits. *Id.* at 1154.

The acts alleged by Swanson, then, do not fall within the scope of § 1140. Even if the court were to accept the factual allegations made in Count V, defendants clearly did not directly affect the employment relationship which § 1140 is designed to protect.

### 5. The LMRA Claim (Count VII)

Count VII alleges that defendants, by enacting a structurally deficient plan, violated their duty under § 302(c)(5) of LMRA, 29 U.S.C. § 186(c)(5), to use the Plan solely and exclusively for the benefit of employees and employer contributors. Swanson contends that the Plan is deficient because it defines "retirement" as a discontinuance of employment, whereas in practice defendants consider an employee retired once he has signed retirement papers. Swanson also argues that defendants violated § 186 by arbitrarily determining that he had irrevocably retired even though he continued to work in the industry.

Defendants contend that the acts alleged by Swanson have no relevance to § 186, which, they claim, deals only with certain types of financial transactions. Swanson, however, insists that courts have recognized liability under § 186 for creating structurally deficient pension plans and for arbitrarily interpreting those plans.

Section 186 makes unlawful certain types of payments from employers to employees, employee representatives, or labor organizations. 29 U.S.C. § 186(a). The purpose of the statute is to avoid the danger of employers improperly influencing union representatives. *Baum v. Nolan*, 853 F.2d 1071, 1074 n. 2 (2d Cir.1988), *cert. denied*, 489 U.S. 1053, 109 S.Ct. 1313, 103 L.Ed.2d 582 (1989). The statute provides an exception, however, for payments by employers to trust fund pension plans "for the sole and exclusive benefit of the employees of such employer." 29 U.S.C. § 186(c)(5).

■■■ Federal courts have jurisdiction to remedy "structural" defects in § 186(c)(5) trusts. *Local 50, Bakery & Confectionery Workers Union v. Local 3, Bakery & Confectionery Workers Union*, 733 F.2d 229, 234 (2d Cir.1984). However, the precise scope of this jurisdiction "is far from settled," and "[r]ather than attempt to define what is meant by the term 'structural defect,' most courts considering the issue have found it prudent to determine the issue on a case by case basis." *Id.* at 233.

■■■ In *Cuff v. Gleason*, 515 F.2d 127 (2d Cir.1975), the Second Circuit "joined the courts that have taken a narrow view" of § 186(e) as only giving jurisdiction to restrain violations of the basic structure provided by Congress for § 302 pension funds, not to remedy violations of fiduciary obligations or standards of prudence in the administration of the trust fund. *Lugo v. Employees Retirement Fund of Illumination Prod. Indus.*, 529 F.2d 251 (2d Cir. 1976), *cert. denied*, 429 U.S. 826, 97 S.Ct. 81, 50 L.Ed.2d 88 (1976). Under this view, jurisdiction exists where the plaintiff claims that the trust provisions themselves violate the "sole and exclusive benefit" provision of § 186(c)(5), but not where the plaintiff alleges only that the application of the rules to his individual claim was arbitrary and capricious. *Id.* 529 F.2d at 255.

The rule in this Circuit, then, is that § 186(c)(5) "does not give federal courts jurisdiction to examine the propriety of the denial of a pension under the terms of a plan or maladministration by trustees." *Riley v. MEBA Pension Trust*, 570 F.2d 406, 412 (2d Cir.1977). Moreover, even the courts' power to remedy structural deficiencies is limited, for the Court of Appeals

"has not displayed enthusiasm for the notion that § 302(c)(5) gave the federal courts a roving jurisdiction over even the structure of pension plans." *Id.*

■ Under this "narrow view" of § 186(c)(5) jurisdiction, Swanson's LMRA claim must be dismissed. Despite Swanson's attempt to characterize Count VII as based on a "structural" defect, it is obvious from the allegations of the complaint that in fact this claim centers on the denial of benefits in Swanson's individual case. For example, Paragraph 73 of the complaint alleges that defendants violated § 186 "by arbitrarily determining that plaintiff irrevocably retired for purposes of calculation of benefits merely because he signed certain retirement forms, even though he continued to work in the industry." Aside from the lack of support for these allegations in the record, this claim plainly does not relate to the structure of the plan, but to "a simple breach of fiduciary duty," which does not give rise to jurisdiction under the statute. *Haley v. Palatnik,* 509 F.2d 1038, 1040 (2d Cir.1975); *see also Baum,* 853 F.2d at 1075 n. 2 (breach of fiduciary duty in trust administration does not amount to structural defect).

Swanson also alleges that the Plan was structurally deficient insofar as the its definition of "retirement" was not consistent with the Trustees' and Administrator's actual practices. Even if the Plan were misleading, however, this would not establish a § 186(c)(5) violation, for Swanson does not allege a structural defect within the Plan so much as a variance between the plan's terms and defendants' practices.[6] The reasoning of the Second Circuit in *Riley, supra,* is particularly apt in this regard:

It is not obvious … why a plan is not "for the sole and exclusive benefit of the employees of such employer" simply because the agreed division of pension benefits strikes a court as unfair; the case might stand differently if, e.g., it were shown that the benefits were so meager that unnecessary reserves were being accumulated or that the plan was heavily weighted in favor of a class of employees from which union officials were commonly drawn.

*Riley,* 570 F.2d at 413.

Swanson's allegations concerning the definition of "retirement" indicate at most that some employees might have their benefits calculated based on an earlier retirement date than they had anticipated. Even if unfair, however, this does not show that the Plan was not "for the sole and exclusive benefit of the employees." At bottom, Swanson's LMRA claim simply restates his ERISA claims, which the court has already found to be without merit. Even if they were not, however, these claims would best be remedied under ERISA. As the Court of Appeals stated in *Riley,* "now that we have ERISA with its extensive provisions for fiduciary responsibility, … there can be little justification for relying on § 302(c)(5) to accomplish the same goals." *Id.*

---

6. Although *Valle v. Joint Plumbing Indus. Bd.,* 623 F.2d 196 (2d Cir.1980), might at first appear to support a finding of LMRA jurisdiction, a careful reading of that decision shows otherwise. The court in *Valle* stated that "However reasonable the rules [regarding pension eligibility] may be on their face, trustees cannot be allowed to apply them in an arbitrary and capricious manner to deny benefits." *Id.* at 203. Citing several cases from other circuits and one district court case, the court also stated that "[i]n determining whether denial of benefits constitutes a 'structural' defect in violation of § 302(c)(5), several courts have sought to determine whether the rules were arbitrary and capricious as applied." *Id.* at 201 n. 8.

Nevertheless, the court did not actually hold that claims relating to the application of rules to individual plaintiffs will support federal jurisdiction. Finding that the plaintiff's assertions of *per se* unreasonableness of the rules at issue sufficiently alleged a structural defect, the court stated that even if the claims concerning application of the rules to individuals did *not* independently support federal jurisdiction, the district court could properly exercise pendent jurisdiction over them. In fact, the court was forced to look to state law for guidance in determining whether the rules were arbitrary and capricious as applied because of its "past refusals to evaluate under federal law the application of pension eligibility rules to an individual claimant …" *Id.* at 203 n. 15. Cases decided since *Valle* make plain that the court has not abandoned its narrow view of § 186(c)(5). *See Baum,* 853 F.2d at 1075 n. 2; *Local 50,* 733 F.2d at 234.

### Conclusion

Defendants' motion for summary judgment is granted as to all counts, and the complaint is dismissed in its entirety.

IT IS SO ORDERED.