Walter F. VALENTINE, Plaintiff,

v.

CARLISLE LEASING INTERNATIONAL COMPANY, Carlisle Companies Incorporated, Marubeni Corporation, Marubeni America Corporation, Dennis J. Hall and Richard S. Husted, Defendants.

No. 97–CV–1406.

United States District Court, N.D. New York.

June 23, 2000.

Liddle & Robinson, L.L.P., New York City, W. Dan Boone, of counsel, for plaintiff.

Bond, Schoeneck & King, L.L.P., Syracuse, New York City, Louis Orbach, of counsel, for defendants Carlisle Leasing International Company, Carlisle Companies Incorporated, Dennis J. Hall and Richard S. Husted.

Proskauer Rose L.L.P., New York City, Allen I. Fagin, Michael H. Roffer, of counsel, for defendants Carlisle Leasing International Company and Carlisle Companies Incorporated.

## MEMORANDUM—DECISION AND ORDER

MORDUE, District Judge.

### INTRODUCTION

Defendants Carlisle Leasing International Company ("CLIC"), Carlisle Companies Incorporated ("CCI"), Dennis J. Hall [1]

---

1. Hall is Vice Chairman and Chief Operating Officer of CCI. He served as President of CCI between 1995 and 1999, and as Executive Vice President, Treasurer & Chief Financial Officer between 1989 and 1995. At the time of Valentine's alleged resignation, Hall was Chairman of the Partners' Committee, which managed CLIC (see n. 3, *infra*).

and Richard S. Husted[2] move for summary judgment under Fed.R.Civ.P. 56(b) dismissing plaintiff's remaining claims.

Plaintiff cross-moves to add as defendant Container Leasing International, L.L.C., d/b/a Carlisle Leasing International, L.L.C., successor to CLIC.

### FACTS

On February 15, 1993, plaintiff Walter F. Valentine was hired as Executive Vice President by CLIC, a newly-formed refrigerated container leasing company.[3] The offer letter states: "It is Carlisle's intention to allow you to earn equity in the business.... Under this arrangement you will be able to earn up to a maximum of 5% of the outstanding equity." On December 9, 1994, Valentine was made President of CLIC. In January 1996, CLIC established an Executive Incentive Plan ("Plan"), pursuant to which Valentine could earn up to 5% equity interest in CLIC over a period of six years. The Plan establishes a schedule under which the interest, measured in terms of "Performance Units," would vest in six annual installments from January 1, 1996, to January 1, 2001. The interest would become fully vested in 2001 or "upon the Participant's termination of employment from the Company due to death, permanent disability or retirement." Valentine would not, however, receive any payment until 2014. The Plan further provides: "The effect of a 'for-cause' termination is a forfeiture by the terminated Participant of all Units (whether vested or unvested.)."[4] The "Partners' Committee," which was responsible for management of CLIC, administered the Plan.

2. Husted is President of the Carlisle Systems & Equipment Group, a division of CCI. Husted first jointed CCI in September 1995 and was responsible for the management of CCI's perishable cargo segment, which includes CLIC.

3. CL Reefers, Inc., a subsidiary of CCI, is a partner in CLIC. The Joint Venture and Partnership Agreement among CL Reefers, Inc., MCS Reefers and MAC Reefers, the other two partners in CLIC, provides for the management of CLIC through a Partners' Committee comprising six members, appointed by the partners.

4. Pertinent portions of section five of the Plan, entitled "Payments on Performance Units" provide as follows:

(a)(i) In the event of a Participant's termination of employment from the Company due to death, permanent disability, retirement or other event, other than termination for cause (as defined in Section 5(g)) ... and provided the Participant continues to comply with all of his obligations under the Plan, the Participant shall be entitled to receive from the Company an amount, with respect to the vested percentage of each Performance Unit in the Participant's Account, equal to the Company value multiplied by a fraction, the numerator of which shall be the number of vested Performance Units then credited to the Participant's Account and the denominator of which shall be 100 (the "Plan Percentage").

\*\*\*

(g) For purposes of the Plan, "termination for cause, shall mean termination of employment of a Participant due to the Participant's:

(i) serious misconduct as an employee of the Company involving, but not limited to, misappropriating any funds or property of the Company or attempting to obtain any personal profit from any transaction in which the Participant has an interest which is adverse to the interest of the Company, unless the Participant shall have first obtained the written consent of the Committee;

(ii) conviction of a felony;

(iii) deliberate disregard of the reasonable instructions of the Committee

(iv) failure to cure deficiencies in his performance as an employee of the Company as determined by the Committee, but only after written notice of such deficiencies and the need to cure has been delivered to the Participant by the Committee and a period of at least thirty (30) days has passed from the date of delivery of such notice and such deficiencies have not been cured;

(v) violation of any material provision of the Plan; or

(vi) a Participant's resignation or other voluntary termination of employment.

The effect of a "for cause" termination is a forfeiture by the terminated Participant of all Units (whether vested or unvested)."

After a meeting on October 3, 1996, Hall sent Valentine a letter dated October 8, 1996, stating: "[T]he Partners' Committee has accepted your offer of resignation tendered to me last Thursday [October 3, 1996] in Greenwich, Connecticut[.]" By letter to CLIC from Valentine's counsel, dated February 6, 1997, Valentine claimed a vested interest in CLIC under the Plan, asserting that he had not resigned at any time and that on or about October 8, 1996, he had been terminated without cause.

The minutes of a Partners' Committee Meeting on April 8, 1997, reflect that the Committee made the following findings and resolutions:

1. Mr. Valentine has on more than one occasion discussed the formation of a competitive leasing company with certain Company employees, customers and suppliers to determine their receptiveness to such a venture. Mr. Valentine's actions included solicitations of American President Lines ("APL"), the Company's largest customer. According to Mr. Valentine, he and Mr. Earl Prosek, Vice President, Equipment Manager of APL, calculated the early cancellation fees provided for in the existing container leases and concluded that the fees would not prevent APL from canceling the leases, redelivering the previously leased containers to the Company and leasing replacement containers from the competitive leasing company. Mr. Valentine also frequently stated that he discussed financing the competitive leasing company with certain lenders and that financing was available.

2. Mr. Valentine disclosed confidential information to Company customers, suppliers and other third parties. The confidential information included, customer lists, leasing rates, container cost information, financing terms and other confidential matters.

3. Mr. Valentine repeatedly complained about the adequacy of his salary and general compensation arrangement. These complaints were shared with Company employees, customers and suppliers and became a significant distraction for the staff.

4. In May, 1996, Mr. Valentine brought a handgun into the office. The presence of the gun was extremely disturbing to several Company employees, particularly Ms. Yingst. It was also discovered that the gun was removed from its case. The possession of a firearm on Company property is a violation of Company policy and is a dischargeable offense.

5. On several occasions, Mr. Valentine received gifts from customers and suppliers in violation of Company policy. In addition, violations of Company expense reimbursement policy were uncovered.

6. Mr. Valentine fraudulently represented on his resume that he graduated from Bradley University. This resume was submitted to various lenders in connection with loans to the Company.

\*     \*     \*     \*     \*     \*

RESOLVED, that the entire Partners' Committee shall constitute the Plan Committee for purposes of administering the Plan;

RESOLVED, that the Committee has determined to deny Mr. Valentine's claim in its entirety because his resignation constitutes a "termination for cause" as described in Section 5(g)(vi) of the Plan. In accordance with Section 5(g) of the Plan, the effect of a "termination for cause" is the immediate forfeiture of all Performance Units (whether vested or unvested);

RESOLVED, that the Committee has also determined that Mr. Valentine committed acts of serious misconduct while employed as President of the Company, including breaches of his duty of loyalty, disclosure of confidential information to third parties, acceptance of gifts from suppliers in violation of Company policy, possession of handgun on Company premises, mistreatment of staff, expense account irregularities and falsification of

his resume. These actions constitute "serious misconduct" as contemplated by Section 5(g)(i) of the Plan and, therefore, constitute grounds for a "termination for cause" under that Section. In accordance with Section 5(g) of the Plan, the effect of this finding is the immediate forfeiture by Mr. Valentine of all Performance Units (whether vested or unvested);

RESOLVED, that the Committee has determined that Mr. Valentine's disclosure of confidential information violated Section 6 of the Plan and that the disclosure constitutes grounds for a "termination for cause" as described in Section 5(g)(v) of the Plan. In accordance with Section 5(g) of the Plan, the effect of this finding is the immediate forfeiture by Mr. Valentine of all Performance Units (whether vested or unvested)[.]

In a letter dated May 2, 1997, Husted, as Chairman of the Partners' Committee, denied Valentine's claim for benefits. The letter contained statements similar to the findings and resolutions in the minutes of the April 8, 1997, meeting and concluded that as a result of these actions Valentine had forfeited all Performance Units, vested or unvested.

On May 28, 1997, pursuant to section 3(d) of the Plan, Valentine requested review of the denial of his claim. In response, the Partners' Committee held a special meeting on August 21, 1997, at which Valentine and his counsel appeared and made statements. By letter dated September 22, 1997, the Committee confirmed its denial of Valentine's benefits.

In the Amended Complaint, Valentine claims that in 1996, Hall and Husted decided to terminate his employment to prevent him from obtaining the equity interest to which he would be entitled under the Plan. He claims that he never resigned and that he was terminated without cause. He asserts various state law claims as well as a claim under section 502(a)(1)(B) of ERISA (29 U.S.C. § 1132(a)(1)(B)) to recover vested benefits, a claim under section 510 of ERISA (29 U.S.C. § 1140) for wrongful termination of his employment for the purpose of depriving him of his Plan benefits, and a claim under section 502(g) of ERISA (29 U.S.C. § 1132(g)) for attorney's fees.

In a decision dated September 30, 1998, Hon. Rosemary S. Pooler, then a District Court Judge, dismissed all of Valentine's state law claims, as well as the section 502(a)(1)(B) claim for vested benefits as against all defendants except CLIC. She also dismissed all claims against defendants Marubeni Corporation and Marubeni America Corporation for lack of jurisdiction. The underlying motion did not address Valentine's claim under section 510. Thus, the claims presently remaining are the section 510 claim against CLIC, CCI, Hall and Husted, and the section 502(a)(1)(B) claim against CLIC, plus the attorneys fee claim, all of which are contained in the fifth cause of action.

## THE MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment dismissing the remaining claims. With respect to the section 510 claim, they urge that the record establishes that Valentine resigned, that, in any event, they had legitimate grounds to terminate his employment, and that nothing in the record supports the allegation that they were motivated by an unlawful purpose under ERISA. With respect to the section 502(a)(1)(B) claim, defendants assert that the plan fiduciaries had ample grounds to deny benefits to Valentine and that therefore there is no basis to find that the fiduciaries' determination was "without reason, unsupported by substantial evidence or erroneous as a matter of law."

### Summary judgment

Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmovant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.

R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant satisfies the burden of establishing that there is no genuine issue of material fact, then the burden shifts to the nonmovant to proffer evidence demonstrating that a trial is required because a disputed issue of material fact exists. *Id.* If, as to the issue on which summary judgment is sought, there is evidence in the record from any source from which an inference could be drawn in favor of the nonmoving party, summary judgment is improper. *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995).

**Unlawful termination under section 510**

Plaintiff asserts a claim under section 510 of ERISA,[5] which prohibits the discharge of a participant in an employee benefit plan for the purpose of interfering with the participant's attainment of any right under the plan. Section 510 was designed primarily to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *Dister,* 859 F.2d at 1111 (quoting *West v. Butler,* 621 F.2d 240, 245 (6th Cir.1980)).

An essential element of a plaintiff's proof under section 510 is to show that an employer was at least in part motivated by the specific intent to engage in activity prohibited by section 510. *Dister,* 859 F.2d at 1111. No section 510 cause of action lies "where the loss of benefits was a mere consequence of, but not a motivating factor behind, a termination of employment." *Id.* (citing *Gavalik v. Continental Can Co.,* 812 F.2d 834, 851 (3d Cir.1987) ("Proof of incidental loss of benefits as a result of termination will not constitute a violation of § 510.")). Thus, Valentine must prove more than the fact that his termination precluded him from vesting

into the Plan; he must demonstrate defendants' unlawful purpose.

The Second Circuit has applied the analytical framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to wrongful discharge cases under section 510 of ERISA. *Dister,* 859 F.2d at 1112. The Supreme Court has summarized the *McDonnell Douglas* procedure as follows:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citations and internal quotation marks omitted).

*I. Prima facie case*

In considering whether Valentine has come forward with a *prima facie* case, the Court notes that the burden of establishing a *prima facie* case is not onerous, *Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997), *cert. denied* 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); indeed, it has been described as "minimal." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The Court concludes that Valentine has met his "minimal" burden of establishing a *prima facie* case. *See St. Mary's,* 509 U.S. at 506, 113 S.Ct. 2742.

---

**5.** Section 510 of ERISA (29 U.S.C. § 1140) provides, *inter alia,* that it is unlawful "for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to

which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan...."

First, it is undisputed that Valentine was a beneficiary under CLIC's Plan and, therefore, is protected by section 510. Second, it is undisputed that Valentine was qualified for his position. Third, there is some evidence that Valentine was discharged from his employment. There is also some evidence to support plaintiff's assertion that in terminating Valentine's employment, defendants were motivated, at least in part, by an intent to prevent him from attaining benefits. In applying the *McDonnell Douglas* analysis to section 510 cases, the *Dister* Court recognized "the reality that direct evidence of discrimination is difficult to find precisely because its practitioners deliberately try to hide it. Employers of a mind to act contrary to law seldom note such a motive in their employee's personnel dossier." *Dister*, 859 F.2d at 1112 (citations omitted). The Court further stated: "Summary judgment is particularly disfavored in benefits discrimination cases because the existence of intent to interfere with an employee's benefit rights is critical in § 510 cases—yet is seldom the subject of direct proof." *Dister*, 859 F.2d at 1111.

The relevant proof regarding defendants' intent is discussed in greater detail below in the discussion of the question of pretext. Such proof includes evidence arguably suggesting that defendants were reluctant to implement the promised plan, such as defendants' the three-year delay in doing so, as well as the provision in the Plan delaying payout for 18 years. Also, Husted's statements to the effect that, while he was investigating Valentine, he used the termination-for-cause provisions of the Plan as a "guide," may be interpreted as evidence that Husted undertook the investigation for the purpose of building a case against Valentine to justify terminating him and denying his benefits. Moreover, the lack of clear documentation regarding whether Valentine resigned, was terminated, or both, lend some support to Valentine's position that the Committee manufactured "after-the-fact" justifications for its actions.

## II. Non-discriminatory reasons for termination

Defendants offer the following non-discriminatory reasons to explain the termination of Valentine's employment and justify the forfeiture of all benefits under the Plan: (a) Valentine resigned from his employment, (b) Valentine committed "serious misconduct" within the meaning of the Plan, and (c) Valentine deliberately disregarded the instructions of Mr. Hall not to contact CLIC staff over the weekend of October 4–6, 1996.

## III. Pretext

### A. Falsity of reasons given

In support of his claims, Valentine urges that the reasons given for denial of his benefits are merely pretextual. He first argues that the reasons are demonstrably false.

### 1. Resignation

Whether Valentine verbally resigned or offered to resign on October 3, 1996, is sharply disputed. No written resignation exists. Valentine categorically denies having resigned or offered to resign. Hall, the only person present with Valentine at the October 3, 1996, conversation, testified about the conversation: "I don't remember the words precisely, but ... he communicated to me what I took to be his offer of a resignation." Although Husted testified that Hall told him of Valentine's resignation immediately after Hall's meeting with Valentine, there is evidence that Hall did not mention Valentine's alleged resignation later that same day at a dinner meeting of the senior executives of CLIC, attended by Hall and Husted. In the October 9, 1996, notice of the upcoming Partners' Committee meeting scheduled for October 23, 1996, Valentine's resignation is listed as one of the topics for discussion.

According to Hall's October 8, 1996, letter, the Partners' Committee accepted Val-

entine's alleged October 3, 1996, offer of resignation. It is undisputed, however, that the Partners' Committee did not meet by telephone or otherwise from October 3, 1996, until the writing of the letter. Moreover, it is arguable that the members of the Partners' Committee themselves doubted the effectiveness of Valentine's resignation inasmuch as, after Valentine claimed benefits under the Plan, the Committee asserted grounds to terminate him for cause.

### 2. Termination for cause

As noted, after Valentine's alleged resignation and his claim for benefits, the Partners' Committee made findings and resolutions deeming his resignation to constitute termination for cause and further finding that he committed serious misconduct warranting termination for cause. The first such findings and resolutions were made at the April 8, 1997, meeting, six months after Valentine's alleged resignation and after Valentine claimed benefits under the Plan. The minutes of this meeting reflect that defendants determined that Valentine was guilty of serious misconduct and disclosure of confidential information. It is not clear precisely what evidence the Committee relied on; some portion of the evidence relied on at this meeting is disputed, hearsay and/or conclusory. For example, the affidavits of Frank P. Loiacono, CLIC's Vice President of Operations, and Ellen M. Gall, CLIC's Controller, and the letter of resignation from Valentine's former secretary, Kathryn Yingst, are rife with hearsay and conclusory assertions. Nor, under all of the circumstances, do Valentine's admissions in his response to defendants' Local Rule 7.1 statement conclusively establish that defendants had adequate grounds to terminate plaintiff for cause.

### 3. Disregard of Hall's instructions

Months later, defendants asserted an additional ground for termination for cause, i.e., Valentine's alleged deliberate disregard of Hall's instructions not to contact CLIC staff over the weekend of October 4–6, 1996. The Court observes that it is questionable whether, even if Valentine did disobey these instructions, such conduct could reasonably amount to serious misconduct within the meaning of the Plan.

■ There is sufficient evidence in the record to create a question of fact on the issue of the truth or falsity of the reasons given by defendants for their actions. The Supreme Court has recently confirmed that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.,* —— U.S. ——, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000).

### B. Discriminatory intent

Valentine further argues that, in addition to the evidence of the falsity of the reasons given for his termination, there is sufficient evidence that the true reasons are discriminatory to withstand summary judgment. As noted above, defendants did not implement the Plan until three years after Valentine was hired. Defendants included in the Plan a provision delaying payout for 18 years, and adhered to this provision despite the recommendation of the Sibson & Company Executive Pay Review that the Plan should afford earlier access to the benefit. This study had been commissioned by CLIC management in response to concerns voiced by Valentine regarding the adequacy of his compensation. Although defendants present credible explanations for these facts, a finder of fact could conclude that they lend some support to Valentine's position.

Husted testified that prior to the October 3, 1996, meeting, he and other members of the Partners' Committee reviewed Valentine's performance. Husted stated that they "wanted to look at what his [Valentine's] interests were in the plan and

consider that as part of our over[all] evaluation." He stated that they wanted to consider all aspects of the situation including the plan. He further stated:

A. ... So we would pull it out and start looking at it [i.e., the Plan], and then make some determinations as to what the plan says, and recognizing that this is what, you know, would guide our actions.

Q. In what way would the plan guide your actions?

A. A review of the plan and looking at the language and of "termination with cause" and what constitutes a "termination with cause", and try to match that against some of the things that were starting to be uncovered in our investigation of Walt's management style and decision-making.

Valentine argues that these statements demonstrate that the purpose of the review of his performance was to lay the groundwork for his termination on grounds which would constitute cause under the Plan, so as to justify denying him the benefits to which he was entitled.

Valentine also points out that in the October 8, 1996, letter accepting his alleged offer to resign, there is no mention of termination for cause. As noted, the first documentary evidence referring to allegations of serious misconduct are found in the minutes of the April 8, 1997, meeting, six months after Valentine's alleged resignation and after Valentine claimed benefits under the Plan. Moreover, an additional reason given for Valentine's termination, his disregard of Hall's instructions, was not mentioned until months later. The doubt cast on the events surrounding Valentine's resignation or termination, in light of the substantial financial consequences for both Valentine and CLIC, viewed in the context of the entire record,

are sufficient to raise a question of fact on the issue of pretext.

**Review of Plan administrator's determination under section 502**

■ Turning to Valentine's challenge under section 502(a)(1)(B) of ERISA (29 U.S.C. § 1132(a)(1)(B)) [6] to the determination of the Partners' Committee to deny his claim for benefits, the Court notes that, where the written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, a court will not disturb the administrator's ultimate conclusion unless it is "arbitrary and capricious." *See Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995). Under the arbitrary and capricious standard of review, a court may overturn a decision to deny benefits only if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* at 442.

Section 3 of the Plan herein gives the plan administrator "the authority to interpret the Plan, ... to have exclusive authority and discretion to construe any uncertain or disputed tem or provision of the Plan and to make any other determinations which it believes necessary or advisable for the administration of the Plan.... All determinations and interpretations by the [administrator] ... shall be given deference in all courts of law to the extent allowed by applicable law." The Court finds that the Plan in issue confers on the Partners' Committee the discretionary authority to determine eligibility within the meaning of *Pagan*, 52 F.3d at 441, such that the determination to deny plaintiff's claim for benefits is reviewable under the "arbitrary and capricious" standard.

■ The Plan is administered by the entire Partners' Committee, acting in its capacity as the Plan Committee, the same body which is alleged to have terminated Valentine's employment for the prohibited

6. Section 502(a)(1)(B) of ERISA (29 U.S.C. § 1132(a)(1)(B)) provides: "A civil action may be brought ... by a participant or beneficiary ...' to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"

purpose of depriving him of plan benefits in violation of section 510. The Court has found that questions of fact exist regarding whether the Committee violated section 510. Certainly the question of whether the Committee terminated Valentine in violation of ERISA is relevant to the question of whether the Committee acted reasonably in denying his claim for benefits. Thus, the record presently before the Court does not enable the Court to determine as a matter of law whether the denial of benefits was rational, proper and supported by substantial evidence. Accordingly, the issues relative to section 502 cannot be resolved on this motion.

## CROSS MOTION

Valentine cross-moves to add as defendant Container Leasing International, L.L.C., d/b/a Carlisle Leasing International, L.L.C., successor to CLIC. Defendants do not object to the substantive relief requested, but assert that the motion is untimely and defective. They further state that the relief requested is unnecessary because the proposed new defendant is the same entity as CLIC, which is already a defendant. Inasmuch as defendants do not raise a substantive objection to the relief requested, the Court grants the cross motion.

## CONCLUSION

The Court finds that the record as a whole, considered in a light most favorable to plaintiff, presents questions of fact on the question of whether defendants terminated plaintiff in violation of section 510 and the related question of whether the denial of benefits to plaintiff was arbitrary and capricious. Accordingly, defendants' motion for summary judgment is denied.

Plaintiff's cross motion is granted.

It is therefore

ORDERED that defendants' motion for summary judgment is denied in its entirety, and it is further

ORDERED that plaintiff's cross motion to add as defendant Container Leasing International, L.L.C., d/b/a Carlisle Leasing International, L.L.C., is granted.

IT IS SO ORDERED.